## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

LUCIA FANCHER, individually and
as personal representaive of the
ESTATE OF NICK DOMINGUEZ,

      Plaintiff,

v.                                                      No. Civ. 11-118 LH/LAM

JOHNNY BARRIENTOS, in his individual capacity,
SHERIFF TODD GARRISON, in his individual and
official capacity, and the COUNTY OF DOÑA ANA,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On November 23, 2011, Defendants Johnny Barrientos, Sheriff Todd Garrison, and the

County of Doña Ana ("Defendants") filed a Motion for Summary Judgment and Memorandum in

Support of (Doc. 47). The Court, having considered the motion, briefs, evidence, relevant law, and

otherwise being fully advised, concludes that the motion should be granted in part and denied in

part, as described more fully herein.

## I.      FACTUAL BACKGROUND

### A.      The March 29, 2010 Shooting

On March 29, 2010, at approximately 5:41 p.m., Deputy Barrientos responded to a reported

theft of two 20-packs of bottled Budweiser beer from the Mesquite Mercantile in Mesquite, New

Mexico. (Defs.' Mot. for Summ. J. (Doc. 47), Undisputed Fact ("UF") ¶ 1.) There was no report

that the suspects were armed or threatening. (Pl.'s Ex. 2 (Doc. 56-2) at 24:22-27:20.) Deputy

Barrientos was on duty, in full uniform with his badge displayed, and driving a marked patrol

vehicle. (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 1.) Defendant Barrientos was issued two patrol

rifles, but his squad car was equipped with only one lock for one of the rifles.  (Pl.'s Resp. (Doc. 55), UF ¶ 14.)  He had the assault rifle in the front seat of his car, rather than in the trunk, because in the front it was more easily accessible to him.  (*See* Pl.'s Ex. 2 (Doc. 56-2) at 64:12-16.)

Upon arrival at the Mercantile, Deputy Barrientos interviewed a female clerk who told him that the manager in the back office had a security camera video of the theft.  (Def.'s Mot. for Summ. J. (Doc. 47), UF ¶ 2.)  Deputy Barrientos reviewed the video, which showed a male in a white shirt and blue jeans at the counter, and a second male wearing a black jacket and black pants moving quickly across the screen.  (*Id.*)  The clerk told Deputy Barrientos that the individual at the counter was named Michael and might live in a trailer near Highway 192.  (*Id.*, UF ¶ 3.)

Deputy Barrientos began searching the property outside the Mercantile when police dispatch advised him at approximately 6:02 p.m. of a trespass involving two vehicles and several subjects drinking at the Helena Chemical plant, across the road from the Mercantile.  (*Id.*, UF ¶ 4.)  While proceeding to the plant, Deputy Barrientos observed a male wearing a white shirt and blue jeans riding a bicycle down an alley.  (*Id.*, UF ¶ 5.)  Deputy Barrientos stopped the bicyclist for questioning at approximately 6:06 p.m.  (*Id.*)  Deputy Barrientos identified the bicyclist as an older man named Carlos Ceniceros, who informed him that he knew where the individuals who stole the beer were and that they were near a red car.  (*Id.*, UF ¶ 6; Pl.'s Ex. 1 (Doc. 56-1).)

As Deputy Barrientos interviewed Mr. Ceniceros, a man from a nearby house approached them and stated that the suspects were in the area of an irrigation canal by a tree.  (Def.'s Mot. for Summ. J. (Doc. 47), UF ¶ 7.)  Deputy Barrientos began searching for the suspects, driving his patrol vehicle northbound on the east side of a large irrigation canal accessible from Highway 192.  (*Id.*, UF ¶ 8.)  He spotted a red car turn onto the west side of the canal driving northbound.  (*Id.*)  Believing that the red car was associated with the theft at the Mercantile, Deputy Barrientos

activated his emergency equipment and initiated a traffic stop at approximately 6:18 p.m.  (*Id.*, UF ¶ 9.)  The red car yielded at a tree near the intersection of the large irrigation canal and a smaller canal.  (*Id.*)

Deputy Barrientos's practice and training are to leave the patrol vehicle running with the emergency equipment engaged during traffic stops.  (*Id.*, UF ¶ 10.)  The window was down to facilitate his visual search of the area.  (*Id.*)  The squad car was parked facing north on a clearing of hard dirt.  (*See* Pl.'s Resp. (Doc. 55), UF ¶ 64.)

Deputy Barrientos approached and questioned the driver who remained in the car.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 11.)  Because the driver was a man in his late fifties and the sole occupant of the vehicle, Deputy Barrientos concluded that he was not involved in the theft and released him.  (*Id.*)

Immediately after the red car drove off, Deputy Barrientos observed Mr. Ceniceros seated on the ground across the large canal to the northeast.  (*Id.*, UF ¶ 12.)  Deputy Barrientos had not moved from where he had been standing beside the driver's door of the red car.  (*Id.*)  He walked toward Mr. Ceniceros to question him further about the suspects.  (*Id.*, UF ¶ 13.)  There was a water pipe spanning the large canal which allowed foot traffic to move from one side to the other.  (*Id.*)  When asked about the suspects' location, Mr. Ceniceros said he did not know, but indicated behind Deputy Barrientos with his eyes and by nodding.  (*Id.*, UF ¶ 14.)

Just then, Deputy Barrientos heard a noise behind him and turned around to see that a beer bottle had landed near him.  (*Id.*)  The bottle landed between 10 to 15 feet away from him.  (Pl.'s Ex. 2 (Doc. 56-2) at 28:7-16.)  In his experience, a bottle can be used as a weapon.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 15.)  He was still unable to see the suspects.  (*Id.*, UF ¶ 14.)

Because the thrown beer bottle indicated someone was hiding and he did not know who it

was or what was going on, Deputy Barrientos drew his weapon and walked toward a large irrigation pump in order to see behind it.  (*See id.*, UF ¶ 16; Pl.'s Resp. (Doc. 55), UF ¶ 30.)  Using a tactical maneuver that he was trained to use, Deputy Barrientos moved around the pump in an attempt to expose the suspects while maintaining a safe distance.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 16.)  Deputy Barrientos saw two young men and a young woman hiding in a depression on the far side of a steel I-beam that served as a foundation for the pump.  (*Id.*)  Deputy Barrientos recognized one of the young men who wore a white shirt and blue jeans, later identified as Michael Herrera, from the Mercantile security video.  (*Id.*, UF ¶ 17.)  Deputy Barrientos also recognized his own cousin, Valerie Gonzalez, and was concerned that she might try to harm him because she had gang affiliations and had previously made negative comments about the fact that Deputy Barrientos was a law enforcement officer.  (*Id.*, UF ¶¶ 17, 19.)  The second young man, wearing black pants without a shirt, was later identified as Nick Dominguez.  (*Id.*, UF ¶ 17.)  Nick Dominguez was 17 years of age at the time.  (Pl.'s Resp. (Doc. 55), UF ¶ 9.)[1]

Deputy Barrientos notified dispatch at 6:21 p.m. that he had three suspects at gun point.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 18.)  He then commanded the subjects to show their hands.  (*Id.*, UF ¶ 20.)  Mr. Herrera complied while remaining on his knees.  (*Id.*)  Ms. Gonzalez also complied.  (*Id.*)  Mr. Dominguez, however, remained crouched on the ground concealing his hands, which concerned Deputy Barrientos because he feared that the suspects could have weapons

---

[1]Plaintiff has submitted evidence that Mr. Dominguez had been evaluated by a mental health hospital in 2009 where he was placed on medication for Schizophrenia or Bipolar Disorder.  (*See* Pl.'s Ex. 9 (Doc. 57-3) at 61:17-23.)  Plaintiff also submitted evidence that, on the night of March 29, 2010, Mr. Dominguez was celebrating his last night in town before going to California, and he had consumed a 12-pack of beer and smoked marijuana.  (*See* Pl.'s Ex. 10 (Doc. 57-4) at 4, 15-16.)  There is no evidence that Deputy Barrientos knew the aforementioned facts, and thus, these facts are not relevant to the qualified immunity analysis.

concealed in their clothing.  (*Id.*)  Mr. Dominguez's failure to comply prevented Deputy Barrientos from frisking the suspects to this point.  (*Id.*)

Deputy Barrientos commanded Ms. Gonzalez to step over the I-beam and lie down, and she complied.  (*Id.*, UF ¶ 21.)  Mr. Herrera remained on his knees and kept his hands raised.  (*Id.*)  Deputy Barrientos ordered Mr. Dominguez to move closer to him and to step over the I-beam and lie down next to Ms. Gonzalez.  (*See id.*; Pl.'s Ex. 2 (Doc. 56-2) at 38:4-13.)  After refusing to comply with several commands, Mr. Dominguez stepped over the I-beam but did not lie down as instructed. (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 21.)  Instead, Mr. Dominguez moved toward Deputy Barrientos in three motions, asking "right here?" each time.  (*Id.*)  Mr. Dominguez moved within a couple of feet of Deputy Barrientos.  (Pl.'s Ex. 2 (Doc. 56) at 38:4-13.)  Deputy Barrientos again ordered Mr. Dominguez to lie down, but instead he dropped to one knee and then suddenly lunged at Deputy Barrientos, grabbing his duty weapon with both hands.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 22.)

As the two men struggled, Mr. Dominguez yelled to the other suspects to run away.  (*Id.*, UF ¶ 24.)  Deputy Barrientos again commanded Mr. Dominguez to release his weapon and get on the ground but he did not comply.  (*Id.*)  During the struggle, Ms. Gonzalez remained prone on the ground with her head and shoulders toward Deputy Barrientos and Mr. Dominguez, while Mr. Herrera remained on his knees.  (*Id.*, UF ¶ 25.)  Both suspects were just a few feet away from the struggle.  (*Id.*)

The men fell to their knees with Mr. Dominguez on Deputy Barrientos's left side.  (*Id.*, UF ¶ 26.)  The weapon discharged into the ground and malfunctioned.  (*Id.*)  The discharge concerned Deputy Barrientos because the bullet could have struck himself, Ms. Gonzalez, or Mr. Herrera, who were both just a few feet away; Mr. Ceniceros, who was a few yards away; or an occupant at one

5

of the residences across the field.  (*Id.*)  After the weapon discharged, Mr. Dominguez continued

trying to take it away from Deputy Barrientos.  (*Id.*, UF ¶ 27.)  Deputy Barrientos forced the

weapon's barrel into the dirt and then drew his taser.  (*Id.*)

Deputy Barrientos tasered Mr. Dominguez in the back.  (*Id.*, UF ¶ 28.)  Although the taser

deployed, it did not work.  (*See* Pl.'s Ex. 2 (Doc. 56-2) at 53:19-54:2.)  Mr. Dominguez then let go

of the gun, pushed free from the struggle, and fled directly toward the patrol vehicle, jumping over

the smaller irrigation canal.  (*See id.* at 54:23-55:6; Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 28.)

Deputy Barrientos saw that the malfunction was a so-called "stove pipe" jam, where the spent shell

casing lodges in the ejection port and prevents the weapon from firing.  (Defs.' Mot. for Summ. J.

(Doc. 47), UF ¶ 29.)  He quickly cleared the malfunction and ran after Mr. Dominguez.  (*Id.*)

Mr. Dominguez entered the driver's side of the patrol vehicle just as Deputy Barrientos

caught up to him.  (*See id.*, UF ¶ 30.)[2]  At that moment, Deputy Barrientos was aware that Mr.

Dominguez had just tried to take his duty weapon away from him and that there were two loaded

long guns in the vehicle.  (*Id.*)  Deputy Barrientos believed that a round fired from one of the long

guns, an AR-15 assault rifle, could have struck a nearby residence.  (*Id.*)

Deputy Barrientos quickly approached the patrol vehicle and, with his duty weapon in his

right hand, tried to remove the ignition keys with his left hand while shouting at Mr. Dominguez to

stop and get out of the vehicle.  (*Id.*, UF ¶ 31.)  Mr. Dominguez pushed Deputy Barrientos's left

hand away, resisting his attempt to remove the ignition keys.  (*Id.*, UF ¶ 32.)  The engine was racing.

---

[2]In his deposition, Deputy Barrientos testified that he left the vehicle unlocked.  (*See* Pl.'s
Ex. 2 (Doc. 56-2) at 82:3-11.)  However, during his April 9, 2010 interview, he stated that Mr.
Dominguez struggled to get into the door of the car because, although the window was down,
Deputy Barrientos had locked the car out of habit.  (Pl.'s Ex. 4 (Doc. 56-4) at 7, 18.)  In either
case, Deputy Barrientos left the vehicle unsecured enough that Mr. Dominguez could get into it.

(*Id.*)  As Deputy Barrientos struggled to remove the ignition keys, Mr. Dominguez shifted the patrol vehicle into reverse.  (*Id.*)

Deputy Barrientos fired his duty weapon at Mr. Dominguez's center mass, or chest area. (*See id.*, Ex. B at 127:24-128:4 (Doc. 47-3); Pl.'s Ex. 4 (Doc. 56-4) at 21 of 42).  He began firing his weapon before the vehicle started going backwards.  (Pl.'s Ex. 4 (Doc. 56-4) at 21-22 of 42.)[3] Deputy Barrientos was sure that he had hit Mr. Dominguez with the initial shot to the chest because he saw him slump.  (*See* Defs.' Mot. for Summ. J., Ex. B (Doc. 47-3) at 128:11-14; Pl.'s Ex. 4 (Doc. 56-4) at 35 of 42.)

After firing his weapon, the car began to press up against his shoulder.  (*See* Pl.'s Ex. 4 (Doc. 56-4) at 21-22 of 42.)  He could feel the car pushing him away and turning him to the right.  (*See id.*)  Deputy Barrientos testified that he took two or three steps away from the car after the first shot. (*See* Pl.'s Ex. 2 (Doc. 56-2) at 103:20-104:11.)  He testified that he felt safer after he backed away from the vehicle.  (*Id.*)  The squad car continued to move in reverse, away from Deputy Barrientos.

---

[3]Defendants dispute this fact, contending that Deputy Barrientos first felt pressure on his left shoulder from the moving car before he fired the first shot.  (*See* Defs.' Mot. for Summ. J. (Doc. 47) ¶ 33.)  In his April 9, 2010 statement to investigators, however, Deputy Barrientos stated that he started firing his weapon before the vehicle started moving backwards.  (Pl.'s Ex. 4 (Doc. 56-4) at 21 of 42.)  Moreover, in his initial statement to investigators on March 29, 2010, Deputy Barrientos did not say that Mr. Dominguez reached for his weapon during the struggle in the car.  (*See* Pl.'s Resp., Ex. 3 (Doc. 56-3) at 2.)  Although Deputy Barrientos may have legitimate explanations for the discrepancies and omissions between his initial statements and his deposition testimony, the Court, at this stage in the proceedings, must construe the facts in Plaintiff's favor.  *See McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) ("Because the plaintiff in this action is deceased and there is no complete witness testimony, we necessarily rely on the facts presented by the defendants, but where there is a discrepancy between the statements of the defendants, we have resolved the dispute by using only those statements most favorable to the plaintiff.")  Deputy Barrientos's initial statements to investigators are admissible evidence.  *See* Fed. R. Evid. 801(d)(2) ("An Opposing Party's Statement").  Construing those statements in the light most favorable to Plaintiff, Plaintiff has evidence that Deputy Barrientos shot Mr. Dominguez before the car began moving backwards and that Mr. Dominguez did not reach for the gun during the struggle in the car.

(Pl.'s Resp. (Ex. 55), UF ¶ 52; Pl.'s Ex. 2 (Doc. 56-2) at 101:25-102:15.)  He nevertheless continued shooting at Mr. Dominguez after he had moved backwards those two to three steps, even though he did not at that time have any indication that Mr. Dominguez was armed.  (*See* Pl.'s Ex. 2 (Doc. 56-2) at 104:9-25.)[4]

Deputy Barrientos fired seven shots.  (*See* Pl.'s Ex. 14 (Doc. 57-8) at 93.)  Mr. Herrera heard a period of silence between two separate rounds of gunfire.  (Pl.'s Ex. 15 (Doc. 57-9) ¶¶ 6-8.)  He heard a series of gunshots, followed by five to seven seconds in which he did not hear any gunshots, followed by the sound of two more gunshots.  (*Id.*)

Mr. Ceniceros saw Deputy Barrientos fire shots at Mr. Dominguez while he was in the car.  (*See* Pl.'s Ex. 1 (Doc. 56-1) ¶ 4.)  Immediately after Deputy Barrientos fired the last shot, Mr. Ceniceros saw Deputy Barrientos at a distance of between eight to ten feet from the side of the squad car.  (*See id.* ¶ 5.)

Deputy Barrientos testified that, if his long gun had not been in the car, he likely would not have shot Mr. Dominguez.  (Pl.'s Ex. 2 (Doc. 56-2) at 118:22-119:21.)  Although he had mace on him at the time he first shot Mr. Dominguez and was within range to use it, Deputy Barrientos did not consider using it instead of deadly force.  (Pl.'s Resp. (Doc. 55), UF ¶ 45.)

Deputy Barrientos was sure that firing his weapon effectively eliminated any threat posed by Mr. Dominguez.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 35.)  At 6:22 p.m., Deputy

---

[4]The evidence presented is confusing as to what Deputy Barrientos believed when the car was moving in reverse away from him.  (*Compare* Pl.'s Resp. (Doc. 55) ¶ 55, Pl.'s Ex. 2 (Doc. 56-2) at 107:8-108:12; *with* Pl.'s Resp. (Doc. 55) ¶ 58, Pl.'s Ex. 2 (Doc. 56-2) at 143:20-144:18.)  Ultimately, whatever Deputy Barrientos's subjective belief was regarding the threat posed by Mr. Dominguez at that time is irrelevant in the analysis, because the standard is objective reasonableness, *i.e.*, whether a reasonable officer in Deputy Barrientos's position could have believed deadly force was required to protect himself or others.

Barrientos notified dispatch that the subject was down.  (*Id.*, UF ¶ 36.)

**B.     The Crime Scene and OMI[5] Investigation**

New Mexico State Police Agent Norman Rhoades was assigned to be the "crime scene manager" of the crime scene in this case.  (Pl.'s Resp. (Doc. 55), UF ¶ 59.)  Based on Deputy Barrientos's initial statement describing events and evidence at the crime scene, Agent Rhoades prepared crime scene diagrams.  (*See* Pl.'s Ex. 13 (Doc. 57-7) at 33:18-35:5.)  The diagrams show that the squad car moved in a backwards arc from its initial position and came to a stop at the end of its backward arc in a field of weeds and fine sand.  (Pl.'s Resp. (Doc. 55), UF ¶¶ 65-66.)  Based on his investigation, Agent Rhoades determined that, when Mr. Dominguez was behind the wheel of the squad car, the car only moved in reverse away from Deputy Barrientos.  (*See id.* at 72:1-21.)

Agent Rhoades indicated in the diagrams that a shot into the chest through the heart was "Possibly 2nd shot;" the shot into the upper left front seat backrest was "Possibly 3rd shot;" the shot into the upper left front door was "Possibly 4th shot;" and the shot into the lower left front door was "Possibly 5th shot."  (*Id.*)[6]  Agent Rhoades acknowledged, though, that the sequences 2 through 5 in the diagrams "could be altered as far as the sequence goes."  (Pl.'s Ex. 13 (Doc. 57-7) at 50:1-9.)  He explained that, for example, wound C could have just as likely been caused by shot 2, 3, 4, or

_____

[5]"OMI" stands for Office of the Medical Investigator.

[6]The diagrams provided the Court show an additional "x" for what is presumably the first shot to hit Mr. Dominguez while he was in the car, but the diagrams in the record do not label or describe the first shot.  (*See* Pl.'s Resp. (Doc. 55) ¶ 62; Pl.'s Ex. 14.)  Based on Agent Rhoades's deposition testimony, however, it appears that in one of his diagrams he describes the first shot to hit Mr. Dominguez as "first shot near chest."  (*See* Pl.'s Ex. 13 (Doc. 57-7) at 50:10-51:12.)  He clarifies that his diagrams only account for the shots fired for which he did a trajectory analysis; in other words, his listing of the shot numbers does not account for the discharge of the firearm that occurred during the initial struggle outside the car between Deputy Barrientos and Mr. Dominguez.  (*See id.*)

5. (*Id.*)  The diagrams further state: "Possibly 6th shot, into upper left front door striking both arms," and "Possibly 7th shot, striking suspect's head."  (*Id.*)  Agent Rhoades acknowledged that shots 6 and 7 could be re-sequenced.  (Pl.'s Ex. 14 at 90.)

Mr. Dominguez's death was caused by multiple gunshot wounds.  (Pl.'s Ex. 8 (Doc. 57-2) at 1, 9; Pl.'s Ex. 16 (Doc. 57-10).)  Significantly, nowhere in the Autopsy Report does the medical investigator pinpoint the cause of death to a particular gunshot wound.  (*See* Pl.'s Ex. 8 (Doc. 57-2).)  Instead, both the Autopsy Report and the Certificate of Death list "Multiple gunshot wounds" as the "Cause of Death," without specifically indicating which of the multiple shots caused Mr. Dominguez's death.  (*See* Pl.'s Ex. 8 (Doc. 57-2) at 1; Pl.'s Ex. 16 (Doc. 57-10).)  Because the evidence in Plaintiff's favor indicates "multiple" shots caused Mr. Dominguez's death, the Court must conclude for purposes of this motion that the first shot to hit Mr. Dominguez, alone, did not cause his death.[7]

### C.     Doña Ana County Policies and Procedures

Sheriff Todd Garrison has been Doña Ana County's Sheriff since 2005, and he is the policymaker for the Doña Ana County Sheriff's Office ("DACSO").  (Pl.'s Resp. (Doc. 55), UF ¶ 2.) Sheriff Garrison relies on his internal affairs department to review and update the DACSO policies. (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 37.)  Sheriff Garrison is a desk-bound administrator who learned about the shooting after it happened, and he had no role in the DACSO's investigation.  (*Id.*, UF ¶ 38.)  Sheriff Garrison does not have sufficient information to assess whether Deputy Barrientos

---

[7]Defendants rely on the deposition testimony of Agent Rhoades in which he indicates that the medical examiner told him that the fatal shot was "shot C", the gunshot wound of the left chest.  (*See* Defs.' Reply, Ex. H (Doc. 64-5) at 104:15-105:5.)  The Court cannot, however, rely on hearsay testimony, and neither party has provided the Court with citation to a hearsay exception that would allow the Court to consider such testimony.

acted in conformance with DACSO policies and procedures.  (*Id.*, UF ¶ 40.)

Defendant Doña Ana County ("DAC") provides DACSO deputies with policies and procedures that are intended to guide their professional comportment.  (Pl.'s Resp. (Doc. 55), UF ¶ 3.)  DACSO's policies on permissible use of force are merely guidelines.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 41.)

The parties dispute what the DACSO's use-of-force policy was at the time of the incident in this case, and each party attached as an exhibit a different version of the purported use-of-force policy.  Neither counsel, however, provided evidence sufficient to authenticate their respective exhibit, as required by Federal Rule of Evidence 901.[8]  Based on the lack of authentication by either party, and the fact that the parties dispute which policy is the relevant one, this Court cannot rely on either written use-of-force policy for purposes of resolving this summary judgment motion.

Deputy Barrientos testified that he was trained that, during traffic stops, it was acceptable to leave his vehicle unlocked, even if there were keys in it.  (*See* Pl.'s Ex. 2 (Doc. 56-2) at 73:8-25, 89:9-18.)  Although he agreed that such a practice was dangerous, he also testified, contradictorily, that he believed that it was good police procedure when conducting an investigation to leave his

---

[8] For example, neither counsel swears under oath that the use-of-force policy in question is what it purports to be.  Nor is there evidence that a particular policy was disclosed in response to a request for production for the relevant use-of-force policy.  Nor was the convoluted and confusing testimony of Sheriff Garrison sufficient to establish which DACSO use-of-force policy, if either, was the one in place on March 29, 2010.  (*See* Defs.' Mot. for Summ. J., Ex. C (Doc. 47-5) at 52:8-24, 76:9-78:9.)  For example, although at one point Sheriff Garrison admitted that Plaintiff's use-of-force policy "is the way in which the use-of-force policy or procedure has been written since [he] began as sheriff," (*id.* at 76:9-78:9), he also contradictorily testified at another point that he is not familiar with DACSO's use-of-force policy and is not aware of whether or not DACSO has any policy governing an officer giving a warning with respect to the use-of-force.  (*See id.* at 50:10-21.)  Additionally, as to the use-of-force policy marked as Exhibit 1 in the deposition, (Pl.'s Ex. 7 (Doc. 57-1)), Sheriff Garrison testified that he did not know whose policy it was and would not know one way or another if it were the DACSO's policy.  (*See* Defs.' Mot. for Summ. J., Ex. C (Doc. 47-5) at 52:8-24.)

vehicle unlocked with keys and a gun in it in order to be able to get to his car quickly.  (*See* Defs.'
Reply, Ex. F (Doc. 64-3) at 76:4-82:22.)  He could not explain why, on the night in question, he
deliberately left his vehicle unlocked with the keys and gun in it.  (*See* Pl.'s Ex. 2 (Doc. 56-2) at
74:20-76:25, 82:3-11.)  He testified, however, that he was not trained on whether or not to leave his
car locked or unlocked during investigations, but his practice was to leave them unlocked.  (*See* Pl.'s
Resp. (Doc. 55), UF ¶ 18.)

Sheriff Garrison does not know of any specific DACSO policy mandating deputies to keep
the three components of their "weapons system" – a rifle, a shotgun, and a handgun – in any specific
part of their patrol vehicle.  (Defs.' Mot. for Summ. J. (Doc. 47), UF ¶ 42.)  Nor does he know of
any specific DACSO policy mandating deputies to keep their windows rolled up, or prohibiting
them from leaving their keys inside a patrol vehicle.  (*Id.*, UF ¶ 44.)  Sheriff Garrison does not know
of any DACSO policy or procedure that addresses whether or not a patrol unit needs to be locked
when there are unsecured shotguns or rifles in the front seat.  (*See* Defs.' Mot. for Summ. J., Ex. C
(Doc. 47-4) at 42:6-45:19.)  Sheriff Garrison believes it is an acceptable law enforcement practice
nationwide to operate a patrol vehicle with the windows down and a long gun in the front seat that
is not secured in a locking mechanism, as the locks are primarily a theft deterrent.  (Defs.' Mot. for
Summ. J. (Doc. 47), UF ¶ 43.)  Additionally, Sheriff Garrison does not know of any specific
DACSO policy mandating deputies to give a verbal warning before firing their weapons.  (*Id.*, UF
¶ 45.)  He also does not know of any specific DACSO policy dictating whether a deputy should
approach an intoxicated subject or what sort of distance should be maintained.  (*Id.*, UF ¶ 46.)

## II.    STANDARD

Under the doctrine of qualified immunity, "government officials performing discretionary
functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force and to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Saucier v. Katz*, 533 U.S. 194, 206 (2001). When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). The plaintiff must demonstrate that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the conduct. *Id.* A court has discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the first inquiry, the question is whether the facts alleged, which are taken in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). The second inquiry is more specific than whether the officer's conduct violated a constitutional right; the question is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances he confronted. *Saucier*, 533 U.S. at 202. "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Moreover, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). If the plaintiff establishes both elements of the qualified immunity test, then

13

the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *Nelson*, 207 F.3d at 1206.

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).

## III.   ANALYSIS

### A.   Excessive Force Claim against Deputy Barrientos (Count I)

Defendants argue that Deputy Barrientos is entitled to qualified immunity on the excessive force claim because his reaction to a violent, fleeing felon was objectively reasonable. Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396. "Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004) (quoting *Saucier*, 533 U.S. at 205).

Courts must evaluate an excessive force claim by considering the totality of the circumstances. *Id.* Among the factors that courts should consider in determining whether a police

14

officer applied excessive force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Other factors to consider when assessing the degree of threat facing an officer include (1) whether the officer ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officer; (3) the distance separating the officer and the suspect; and (4) the manifest intentions of the suspect. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Courts also must consider whether the officer's own reckless or deliberate conduct in connection with the seizure contributed to the need to use the force employed. *Fogarty v. Gallegos*, 523 F.3d 1147, 1159-60 (10th Cir. 2008). Merely negligent actions precipitating a confrontation are not actionable under § 1983. *Jiron*, 392 F.3d at 415 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). "The conduct of the officers before a suspect threatens force is relevant only if it is 'immediately connected' to the threat of force." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1320 (10th Cir. 2009) (quoting *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001)). Officers are not required to use alternative, less intrusive means so long as their conduct is objectively reasonable. *Jiron*, 392 F.3d at 414.

Under the Fourth Amendment, deadly force is justified if a reasonable officer in the defendant's position would have had probable cause to believe that there was a threat of serious physical harm to himself or to others. *Id.* at 415. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "Thus, if the suspect threatens the officer with a weapon or there is probable

15

cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12. A vehicle attempting to run over an officer can constitute a threat by a weapon justifying the use of deadly force. *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010).

The Court must determine whether a reasonable officer in Deputy Barrientos's position could have believed that it was necessary to use deadly force at each precise moment that he did so. *See id.* (examining whether agent "could have reasonably perceived he was in danger at the precise moment that he used force"). Although Defendants argue that the Court need not look at each shot sequentially, the Court disagrees. "[C]ircumstances may change within seconds eliminating the justification for deadly force." *Id.* at 666; *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."); *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003) (noting that, even when officer faces situation in which shooting initially justified, he does not retain right to shoot at any time thereafter with impunity; legality of use of deadly force ends with expiration of threat). Thus, while the Court must look at the totality of the circumstances at each point in time, circumstances justifying the first shot may change and no longer support firing additional shots at a suspect.

Although in some circumstances multiple shots fired in a matter of seconds should be grouped together in the qualified immunity analysis, this case is different. Here, there is evidence that Deputy Barrientos had time between the first shot and the following shots to take a few steps back to get out of the way of the car, to assess the situation, and to know that Mr. Dominguez had slumped and may not have presented a continuing danger to himself or to the public. *Cf. Waterman*,

393 F.3d at 482 ("once Waterman's vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots").   Consequently, the Court will separately analyze the reasonableness of the first shot and the subsequent shots.

>    1.    **The initial shot**

>    >    a.    **Did Deputy Barrientos violate Mr. Dominguez's constitutional rights in firing the initial shot?**

The case of *Thomas v. Durastanti* is instructive in determining the reasonableness of the initial shot.   In *Thomas*, two plain-clothes agents in an unmarked vehicle were looking for a fugitive when they noticed a Lincoln town car speeding away from a high crime area, so they followed it. 607 F.3d at 659.   One of the agents saw that it had a dealer tag, which according to dispatch, was "not in file," so the agents called for a uniformed officer to pull over the Lincoln.   *Id.* at 660.   The Lincoln pulled into a gas station at about the same time that the agents entered the parking lot and partially blocked the driveway that was the Lincoln's most natural path out of the lot.   *Id.*   At the same time, a state trooper responded, activating his emergency lights as he pulled into the gas station and parked behind the Lincoln.   *Id.*   Mr. Jones, in the back passenger seat, started to get out when he noticed two men approaching with guns drawn and pointed at the Lincoln, and he alerted the other two occupants about the approaching armed men.   *Id.* at 660-61.   The following events then transpired:

>    In an effort to get away, Mr. Smith began to drive the Lincoln out of the parking lot, maneuvering around the ATF agents' SUV, which was partially blocking the Lincoln's path. Agent Thompson, who was approaching the driver's side of the Lincoln, had to move out of the way of the Lincoln; as he did so, Agent Thompson hit the Lincoln's front passenger window with the butt of his weapon, trying to break the glass. Agent Durastanti proceeded from the driver's side of the agents' SUV toward the rear of that vehicle and into the path of the Lincoln as it headed around the agents' SUV toward the parking lot exit. Agent Durastanti would testify later that he was concerned that Agent Thompson was in distress, that the Lincoln was coming directly at him and his objective was to stop the Lincoln.   Agent Durastanti fired

17

several shots at the driver. The Lincoln, nevertheless, continued out of the parking lot, hitting Agent Durastanti, who rolled off its hood, landed on his feet, turned around and then fired two more shots at the back of the Lincoln as it proceeded down the street away from the Valero station. . . . Ultimately, the Lincoln stopped a few blocks away. Mr. Smith had been shot in the head; Mr. Thomas had suffered a gunshot wound to his leg.

607 F.3d at 661 (internal citation omitted).

The Tenth Circuit concluded that Agent Durastanti's actions when firing the first round of shots was objectively reasonable, regardless of the speed of the Lincoln, because the driver was advancing towards Agent Durastanti and placing him in harm's way and he had mere seconds to react. *See id.* at 665-66. The Tenth Circuit also determined that Agent Durastanti acted reasonably, even if mistakenly, when firing the second volley of shots, despite the fact that the Lincoln was clearly driving away from him at the time. *See id.* at 666. The Tenth Circuit explained that Agent Durastanti had just been struck by the Lincoln and was disoriented when he fired the shots. *Id.* "Given such a disorienting experience, he had no assurance that the threat posed by the Lincoln had passed; this was a split-second decision concerning the use of deadly force under hardly ideal circumstances." *Id.*

The Tenth Circuit also addressed Agent Durastanti's alternative argument that the shooting was justified because a reasonable officer could conclude that the Lincoln's occupants were at that point dangerous fleeing felons. *See id.* The Tenth Circuit rejected the plaintiff's argument that the occupants of the Lincoln were "harmless" individuals stopped for a routine traffic violation because it ignored the driver's assault on federal agents. *Id.* The court additionally stated: "After narrowly missing Agent Thompson and hitting Agent Durastanti, the officers had no assurance that the Lincoln would be carefully driven as it proceeded on its way with a state trooper in pursuit." *Id.* at 666-67. Although the Tenth Circuit ultimately did not resolve the issue of whether the dangerous

18

fleeing felon rule justified the shooting, the Tenth Circuit's remarks suggest that the protection of the public may have also justified the shooting.

There are many similarities in this case to *Thomas* that dictate a similar conclusion that Deputy Barrientos's action in firing the initial shot was reasonable, even if mistaken.  Deputy Barrientos had just been attacked by Mr. Dominguez.  Deputy Barrientos knew that Mr. Dominguez had committed numerous violent felonies in attacking him, resulting in the discharge of the firearm that could have severely harmed or killed Deputy Barrientos or other bystanders.  Mr. Dominguez was actively resisting arrest and attempting to evade arrest by flight.  He was attempting to use the deputy's own vehicle, which contained loaded weapons, as his mode of evading arrest.  Deputy Barrientos repeatedly issued commands for Mr. Dominguez to stop and get out of the vehicle.  Mr. Dominguez refused to comply and instead continued revving the engine and trying to get the vehicle into gear.  Deputy Barrientos and Mr. Dominguez were in close proximity to one another as they physically struggled for the keys in the ignition.  Mr. Dominguez had just succeeded in getting the vehicle into gear while Deputy Barrientos's arm was still in the car.  Thus, Deputy Barrientos, when he fired the first shot, could reasonably fear for his personal safety from Mr. Dominguez quickly accelerating the vehicle.

The Court recognizes that, at this point, the evidence in Plaintiff's favor shows that Mr. Dominguez was not reaching for the guns, the car was not yet moving, and Deputy Barrientos's body, other than his arm, was to the side of the police car, not in the car's direct path.  Those facts alone, however, are insufficient to establish that Deputy Barrientos acted unreasonably where he had many other reasons to believe a threat to his safety existed, based on the recent attack by Mr. Dominguez and Mr. Dominguez's constructive possession of the police car and firearms.  *Cf. Thomas*, 607 F.3d at 666 (agent's action reasonable, even though at time he fired second volley of

shots, Lincoln was driving away from him); *Phillips v. James*, 422 F.3d 1075, 1083-84 (10th Cir. 2005) (holding that officer's decision to shoot suspect who had barricaded himself in his home with weapons was reasonable, and that officer did not have to wait to be shot at or even to see suspect raise gun and point it at person, where suspect was acting irrationally, refusing to defuse situation, continually threatened officers with harm, and just exclaimed that he had a clean shot at officer); *Robinson v. Arrugueta*, 415 F.3d 1252, 1254-56 (11th Cir. 2005) (holding that officer did not violate Fourth Amendment in using deadly force against suspect who defied officer's order to raise hands and instead grinned as car slowly began to move forward at speed of one to two miles per hour toward officer who was standing only two to four feet from vehicle in narrow space, because even if in hindsight facts showed that officer perhaps could have escaped unharmed, a reasonable officer could have perceived that suspect was using car as deadly weapon).

Plaintiff nevertheless argues that Mr. Dominguez was merely attempting to escape and did not intend to harm Deputy Barrientos with either the car or the guns. It was objectively reasonable, however, based on Mr. Dominguez's recent attack of Deputy Barrientos, for Deputy Barrientos to believe the opposite. With 20/20 hindsight, a court could say that Deputy Barrientos should not have struggled for the keys and instead waited to fire until Mr. Dominguez undoubtedly manifested his intent to harm him, by either driving towards Deputy Barrientos or by pointing one of the guns at him. However, Deputy Barrientos was in a very vulnerable position. Mr. Dominguez fled towards the police vehicle that contained loaded weapons. At the time of the initial shot, Mr. Dominguez had just gotten the car into gear and the deputy's arm was still in harm's way. Moreover, Deputy Barrientos would not have known if Mr. Dominguez intended to continue going in reverse and escaping, or whether he, after getting clear from Deputy Barrientos's attempts to remove the keys, may have altered course and used the car to run down Deputy Barrientos. While,

again, Plaintiff contends that Deputy Barrientos could have waited to find out if Mr. Dominguez intended to use the car as a weapon, Deputy Barrientos would have been in an exposed position had Mr. Dominguez used the guns in the vehicle against him instead.  Mr. Dominguez's decision to take control of the police car, instead of fleeing on foot, escalated the danger to Deputy Barrientos and made it reasonable for him to believe that Mr. Dominguez intended to harm him, and not merely escape.  This was a split-second decision concerning the use of deadly force under hardly ideal circumstances.  *Cf. Waterman*, 393 F.3d at 478-79 (holding that, where suspect had not acted rationally in leading officers on 10-minute chase, had attempted to run one of officers off road, and accelerated upon seeing officers approaching ahead of him with weapons drawn, officers had probable cause to believe that suspect's oncoming vehicle posed immediate threat of serious physical harm to officers, even though they were not in direct path of vehicle at time they shot it).

Furthermore, aside from the danger presented to Deputy Barrientos, a reasonable officer could have believed that, even if Mr. Dominguez's intent was to escape in the police car, Mr. Dominguez presented a danger to the public at large and to other officers, who undoubtedly would have attempted a pursuit of Mr. Dominguez.  The facts here are even more compelling than in *Thomas*.  Deputy Barrientos had probable cause to believe Mr. Dominguez had been consuming alcohol, and he knew that Mr. Dominguez was acting erratically, had assaulted an officer and attempted to take his gun, was refusing to obey commands to stop, was resisting arrest, and was attempting to steal a police vehicle where he had access to long guns in the cab.  These factors set the stage for a potentially highly dangerous chase that could endanger the motoring public.  A reasonable officer in Deputy Barrientos's position could conclude that Mr. Dominguez was a dangerous fleeing felon justifying the use of deadly force.  *Cf. Smith v. Freland*, 954 F.2d 343, 344-47 (6th Cir. 1992) (holding that officer did not violate Fourth Amendment in shooting suspect after

high-speed car chase in which suspect rammed officer's vehicle, even though at the time officer was not in path of suspect's car, because suspect had used car as weapon and proven he would do almost anything to avoid capture, so it was reasonable to believe suspect was a danger to others).

Plaintiff's additional argument that Deputy Barrientos had mace at his disposal and could have used that to subdue Mr. Dominguez is unavailing. The Tenth Circuit has repeatedly held that an officer does not always have to use the least intrusive means as long as their conduct is reasonable. *See, e.g., Thomas*, 607 F.3d at 665 (explaining that whether agent could have stepped out of way of moving vehicle "is immaterial, given that officers do not always have to use the least restrictive means as long as their conduct is reasonable"). Moreover, in this case, Deputy Barrientos had no assurance that mace would end the threat Mr. Dominguez posed. Deputy Barrientos had already deployed his taser to no avail.

The Court must also determine whether Deputy Barrientos recklessly or deliberately brought about the need to use such force. Nothing prior to the time that Deputy Barrientos left his car unlocked would have indicated to a reasonable officer that the suspects he was investigating for a misdemeanor beer theft were likely to attempt to steal his vehicle or the firearms therein. Thus, leaving his loaded long guns in the unlocked squad car, while potentially negligent, does not amount to reckless or deliberate conduct. *Cf. id.* at 668 (holding that plainclothes agent's drawing of weapon and failure to identify himself as police did not amount to reckless or deliberate conduct that unreasonably brought about the need to use deadly force).

It was also not reckless for Deputy Barrientos to attempt to stop Mr. Dominguez from gaining control of the squad car. Both the loaded firearms in the vehicle and the vehicle itself could potentially be used as a weapon against Deputy Barrientos, and he had reason to fear Mr. Dominguez might use them against him. *Cf. Thomas*, 607 F.3d at 670 ("Officer Durastanti was

22

certainly entitled to assist in regaining control of the situation even if it brought him into close proximity of the Lincoln."); *Jiron*, 392 F.3d at 418 (holding that officer's decision to coax plaintiff out of bedroom instead of awaiting arrival of backup "was far from reckless" because, had officer left plaintiff in bedroom, she risked the escape of an armed and agitated suspect into the public and risked potentially more violent confrontation between other officer and plaintiff, had she escaped); *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (holding that officers' response in attempting to stop plaintiff by following him was reasonable, and not reckless or deliberate conduct, where plaintiff communicated he had a gun, emerged from house covering what reasonably could be interpreted as a weapon, and began walking away from house into street).

Plaintiff relies on the cases of *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), and *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), to support her argument that, at the time he fired the first shot, it was clearly established that Deputy Barrientos did not have probable cause to believe that there was a threat of serious physical harm to himself or to others.  Both *Cordova* and *Cupp*, however, are distinguishable.

In *Cordova*, a police pursuit ensued when an officer attempted to stop a truck on suspicion of theft and the driver refused to stop and ran through a red light.  569 F.3d at 1186.  The suspect attempted to ram multiple police vehicles, ran two red lights, and began driving the wrong way down an interstate highway.  *Id.* at 1187.  An officer, who attempted to deploy stop sticks, drew his gun when the truck got close to him and fired multiple shots, the first of which hit the front of the truck, but the rest hit the side.  *Id.*  The fatal shot entered the truck from the side and went through the back of the suspect's head.  *Id.*  On appeal, the officer accepted the district court's premise that he was not in immediate danger and that no innocent bystanders were in the vicinity.  *Id.*  Instead, the question before the Tenth Circuit was limited to whether the potential risk to third parties created

23

by the suspect's driving was alone sufficient to justify the officer's shooting him.  *Id.* at 1187-88.

The Tenth Circuit recognized the general rule that it is not constitutionally unreasonable to prevent escape by using deadly force where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others.  *Id.* at 1190.  The court, however, stated that the general rule "does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death."  *Id.*  The Tenth Circuit explained that, just because a situation may justify ramming a vehicle, which is likely to cause serious injury or death, this does not mean that shooting a suspect in the head, which is almost certainly likely to result in death, is justified.  *See id.* at 1189.  "When an officer employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving."  *Id.* at 1190.  The Tenth Circuit then reasoned as follows:

> To the extent that the district court held that the hypothetical risk Mr. Cordova posed to fellow motorists who might happen along was itself enough to render the shooting reasonable, it was in error. The threat must have been more than a mere possibility. The facts show that Mr. Cordova was driving recklessly down the wrong side of the highway. The facts do not, however, show that any other motorists were in the vicinity, or that other motorists would not be able to spot Mr. Cordova and avoid an accident themselves. Mr. Cordova's behavior did, of course, create risks for other motorists who might come along, but that risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.

> The threat to the officers themselves—if actual and imminent—could of course shift the calculus in the direction of reasonableness. If a reasonable officer in Officer Aragon's position would have feared for his life or the life of his fellow officers, then on one side of the scales would sit not only the potential (even if distant) risk to any motorist who might wander along, but also the very immediate risk of death to the pursuing officers. The urgency of terminating the chase would increase and the balance would tip in the officers' favor. The use of deadly force—even of the level nearly certain to cause death—would likely be justified. Here, however, the threat to the officers is a disputed fact, and for purposes of the summary judgment motion the district court explicitly assumed the officers to be in no immediate danger.

> It is with reluctance that we second-guess the split-second decisions of trained officers reacting to difficult situations in the line of duty. We are not well-suited to

act as a police supervisory board, making finely calibrated determinations of just what type of misbehavior justifies just what level of response. We cannot say, however, that the general risks created by a motorist's fleeing from the police are, without more, enough to justify a shooting that is nearly certain to cause that suspect's death.

*Id.*

Contrary to Plaintiff's argument, the *Cordova* case does not establish that Deputy Barrientos is not entitled to qualified immunity for his initial shot.  Although an officer could conclude that death was nearly certain to occur from shooting Mr. Dominguez in the chest at close range, unlike in *Cordova*, this case involves more than merely the general, uncertain risk of reckless driving posed to a motoring public.  Indeed, the *Cordova* court conceded that if a reasonable officer could have feared for his life or those of other officers, those facts could shift the calculus.  *See id.*  That is the case here.  As explained above, Deputy Barrientos had just been attacked by Mr. Dominguez and had physically struggled for control of his duty weapon, which discharged in the process.  Deputy Barrientos thus had probable cause to believe that Mr. Dominguez would harm him in an attempt to escape.  Mr. Dominguez, at the time of the initial shot, had gained control of the police car while Deputy Barrientos's arm was in the vehicle.  Deputy Barrientos had an imminent reason to fear for his personal safety if Mr. Dominguez accelerated rapidly at that moment.  In addition, Mr. Dominguez had constructive possession of the loaded weapons inside.  Deputy Barrientos had no way of knowing if Mr. Dominguez merely intended to flee or if he intended, once beyond Deputy Barrientos's reach, to use the vehicle and/or guns against him.  Although there were no pedestrians or officers directly behind the police car and the car was currently alongside an irrigation ditch, and not on a busy street, they were near Highway 192, the Mercantile, and other residences.  There were also innocent bystanders nearby : Mr. Ceniceros, Ms. Gonzalez, and Mr. Herrera.  Mr. Dominguez, in struggling for a firearm that discharged near the other citizens, had shown a complete disregard

to innocent bystanders.  Deputy Barrientos had probable cause to believe a chase would have ensued

had Mr. Dominguez sped away.  Deputy Barrientos had already requested back-up.  He had reason

to fear for the safety of the pursuing officers, given that Mr. Dominguez had shown a willingness

to attack an officer to aid in an escape and to use a firearm.  Mr. Dominguez had placed Deputy

Barrientos in a vulnerable position in which he had only moments to judge the danger to himself and

others and to react accordingly.  Unlike in *Cordova*, the degree of risk to Deputy Barrientos was

both imminent and substantial; and the risk to other officers and innocent bystanders, while perhaps

not as imminent, was also substantial.

For the same reasons, *Cupp*, a case relied upon by the Tenth Circuit in *Cordova*, *see id.* at

1193, is inapposite.  The Sixth Circuit in *Cupp* held that driving a stolen police car does not by itself

pose a grave enough danger to the public to justify shooting the suspect.  *See Cupp*, 430 F.3d at 773.

The *Cupp* case, however, lacked many of the facts here showing that Mr. Dominguez presented a

far greater and more immediate risk of death to Deputy Barrientos, other officers, and nearby

citizens.  Indeed, in *Cupp*, the Sixth Circuit's analysis of why its case was distinguishable from

*Brosseau v. Haugen*, 543 U.S. 194 (2004), illustrates the key differences between the facts in *Cupp*

and those of *Brosseau* and here:

> *Brosseau v. Haugen* does not preclude this court from finding the right at issue was
> clearly established because the *Brosseau* Court said that undisputed facts showed
> that the shooting officer believed the suspect had a gun and was fearful for officers
> in the immediate area. . . . In this case, the plaintiff's facts show there was no danger.
>
> The absence of any *Garner* preconditions to the use of deadly force makes this an
> "obvious" case and distinguishes it from *Brosseau*.  In *Brosseau*, the Supreme Court
> reversed the denial of qualified immunity to an officer sued for Fourth Amendment
> violations under § 1983 for shooting a suspected felon as he attempted to flee in a
> vehicle, where the officer had arguable probable cause to believe that the suspect
> posed an imminent threat of serious physical harm to several officers and citizens in
> the immediate surrounding area. Unlike Smith, Haugen was a suspected felon with
> a no-bail warrant out for his arrest, with whom Brosseau had experienced a violent

physical encounter prior to the shooting. Believing that Haugen had entered the Jeep to retrieve a gun, Brosseau broke the windowpane of the Jeep, and attempted to stop Haugen by hitting him over the head with the butt and barrel of her gun. Haugen was undeterred, however, and began to take off out of the driveway, without regard for the safety of those in his immediate vicinity—the three officers on foot, a woman and her 3–year–old child in a small vehicle four feet away, and two men in a parked vehicle 20 to 30 feet away.

The facts in *Brosseau* are not comparable to those in this [*Cupp*] case. In the light most favorable to Smith, there is no comparable evidence that Dunn had cause to believe that Smith posed an immediate risk of death or serious danger to Dunn, Rutherford, or nearby citizens. Smith was being arrested for making harassing phone calls, not a crime involving the infliction or threatened infliction of serious physical harm. Unlike the situation in *Brosseau*, Smith and Dunn never struggled, Smith never displayed any violent tendencies, and the facts support a finding that a reasonable officer in Dunn's position would not have perceived danger to anyone at the scene.

*Cupp*, 430 F.3d at 776 (internal citations omitted).

In contrast to the suspect in *Cupp*, Mr. Dominguez committed numerous violent felonies in attacking Deputy Barrientos and attempting to dispossess him of his firearm; and when in the police car, Mr. Dominguez had ready access to loaded firearms.  These facts put this case closer to *Brosseau*.  It is notable that the Supreme Court granted the officer in *Brosseau* qualified immunity, even though the officer shot the suspect in the back after she had already jumped back away from the vehicle.  *See Brosseau*, 543 U.S. at 196-97.

For all the foregoing reasons, Plaintiff has not met her burden to show that Defendant Barrientos violated Mr. Dominguez's constitutional rights in firing the initial shot at him.

> **b.    Was it clearly established at the time Deputy Barrientos fired the initial shot that his conduct was unlawful?**

Finally, even if this Court's conclusion is wrong and the risk to Deputy Barrientos and others was not imminent enough to justify the level of force nearly certain to cause Mr. Dominguez's death, it was not clearly established at the time that Deputy Barrientos's action in firing the initial

shot violated Mr. Dominguez's Fourth Amendment rights.  The second prong of the qualified immunity analysis requires the court to determine in a more particularized sense whether Deputy Barrientos's actions violated Mr. Dominguez's Fourth Amendment right, *i.e.*, whether it was clearly established that shooting Mr. Dominguez was unconstitutional where Mr. Dominguez was a fleeing, agitated felon who had just attacked an officer and was attempting to flee in a police cruiser and who had constructive possession of firearms, when the officer, the motoring public, and other officers who would have pursued Mr. Dominguez were at risk from that flight.  *Cf. Brosseau*, 543 U.S. at 199-201 (reversing Ninth Circuit's denial of qualified immunity because there were only a handful of cases relevant to situation officer confronted – whether to shoot disturbed felon, set on avoiding capture through vehicular flight, when persons in immediate area were at risk from that flight – and those cases, taken together, show that the officer's actions fell in hazy border between excessive and acceptable force).  Although *Cordova* and *Cupp* were decided before the events at issue here, both are readily distinguishable for the reasons herein given.  Unlike in *Cordova*, which was based solely on the potential risk to unknown third parties, here, Deputy Barrientos faced a substantial threat to his own person as well, more akin to the situation faced by the agent in *Thomas*, decided after *Cordova*.

The case of *Long v. Slaton*, 508 F.3d 576 (11th Cir. 2007), further illustrates how the law was not clearly established at the time.  In *Slaton*, a deputy, responding to a call by a father who wanted his psychotic son to be detained, got out of his cruiser, leaving the keys in the ignition and the driver's door open.  *Id.* at 578.  When the deputy asked the father if his son had been physically violent with him, the father responded, "no."  *Id.*  As the deputy approached the suspect to arrest him, the suspect ran over to and got inside the deputy's cruiser and closed the door.  *Id.* at 579.  The deputy ran to the driver's side of the car, pointed his pistol at the suspect, ordered him to get out of

the car, and threatened to shoot if he did not comply. *Id.* After the suspect shifted the cruiser into reverse and began backing away and down the driveway toward the road, the deputy fired three shots, killing the suspect. *Id.*

The Eleventh Circuit concluded that the deputy's force was objectively reasonable in light of the potential danger posed to officers and the public if the mentally unstable suspect was allowed to flee in a stolen police cruiser: "Different from other vehicles, this fully marked and fully equipped police cruiser had an even greater potential for causing – either intentionally or otherwise – death or serious bodily injury" *Id.* at 580-81. The court noted that failing to stop a psychotic man from driving away in a marked cruiser "not only would have provided the man with a potentially (to say the least) lethal weapon, but also would have cloaked him with the apparent authority of a law enforcement officer." *Id.* at 583. Significantly, the court was not persuaded by the fact that the deputy was not himself in immediate danger by the cruiser, which was moving away from him, because "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Id.* at 581. The court noted "the obvious" – that the suspect could have quickly shifted gears and accelerated towards the deputy at any time. *Id.* n.7.

A comparison of *Cordova* and *Cupp* to *Brosseau*, *Thomas*, and *Slaton* demonstrates how the case law in this area continues to contain hazy borders. An officer who uses deadly force within those hazy borders is entitled to qualified immunity. Such is the case here regarding Deputy Barrientos's action in firing the initial shot.[9]

---

[9]This Court is bound by law to make its own qualified immunity analysis based on all the undisputed facts and those disputed facts construed in Plaintiff's favor. *Cf. Waterman*, 393 F.3d at 478 n.8 (concluding that officers acted reasonably despite plaintiff's expert testimony to contrary and noting that opinions are only as good as evidence upon which they are based).

### 2.      The subsequent shots

This conclusion does not, however, end the inquiry because it is undisputed that Deputy Barrientos fired multiple shots at Mr. Dominguez.  Deputy Barrientos testified that he saw Mr. Dominguez slump after the first shot.  He also testified that, after the first shot, he stepped away from the car, and thus, was not in immediate danger of being run over with the vehicle, which was moving backwards away from him.  Significantly, Deputy Barrientos testified that he felt safer after having taken those steps away from the vehicle.  Additionally, Deputy Barrientos's testimony indicated that Mr. Dominguez was not reaching for the long guns in the vehicle after the first shot.

A jury could construe Mr. Dominguez's slumping as an indication that he was no longer able to control the vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public, Deputy Barrientos, or other responding officers.  Moreover, a jury could also reasonably construe Deputy Barrientos's testimony that he did not fire the second shot until after he stepped back, felt safer, and noticed Mr. Dominguez slump as indicating that enough time passed between the first and second shots for Deputy Barrientos to recognize and react to the changed circumstances and cease firing his gun.  There is thus a question of fact as to whether, under the totality of circumstances, Deputy Barrientos reasonably perceived that he or others were in danger at the precise moments that he fired shots two through seven, and thus, whether those additional shots were excessive.

Defendants argue that the second shot fired, which they argue pierced Mr. Dominguez's heart, was the fatal shot, and therefore, the shots fired afterwards are irrelevant.  The Court

---

Consequently, this Court's qualified immunity determination regarding the initial shot is not effected by the contrary opinion of Plaintiff's expert, Lou Reiter, that Deputy Barrientos's actions were unconstitutional.

concludes, however, that a question of fact exists as to which shot killed Mr. Dominguez. There has not been sufficient evidence presented by the parties to determine which of the gunshots caused Mr. Dominguez's death. The Autopsy Report lists "multiple gun shots" as the cause of death; therefore, more than the first shot may have caused Mr. Dominguez's death. Whether shots two through seven were reasonable is therefore critical to the determination of whether Deputy Barrientos is liable under the Fourth Amendment.

In light of the numerous fact questions that must be resolved by a jury regarding the reasonableness of firing the additional shots, Defendant Barrientos is not entitled to qualified immunity on the excessive force claim as to those shots. The Court will therefore limit the jury's consideration to the reasonableness of firing shots two through seven.

### B.     Section 1983 Claims against Defendants Doña Ana County and Sheriff Garrison (Count II)

#### 1.     Deliberate Indifference Claim against Doña Ana County

In *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978), the Supreme Court ruled that municipalities are subject to Section 1983 liability only when their official policies or customs cause a plaintiff's injuries. *See also Johnson v. Johnson*, 466 F.3d 1213, 1215 (10th Cir. 2006). There must be a direct causal link between the municipal policy or custom and the alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A municipal policy can take the form of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers," whereas a municipal custom includes "persistent and widespread . . . practices of . . . officials." *Monell*, 436 U.S. at 690-91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where

the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 489 U.S. at 388.  The failure to train must reflect a deliberate, conscious choice by a municipality in order for liability to attach.  *See id.* at 389.  Where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," the failure to properly train represents a policy for which the city may be liable if it caused an injury.  *Id.* at 390.  To establish municipal liability under a failure-to-train theory, a plaintiff must prove that (1) an officer violated a constitutional right of the plaintiff's; (2) the violation arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrated a deliberate indifference by the city toward persons with whom the officer comes into contact; and (4) there is a direct causal link between the inadequate training and the unconstitutional conduct.  *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

Plaintiff argues that Defendant DAC exhibited deliberate indifference by failing to provide officers with use-of-force procedures, including restrictions on the use of deadly force, for at least five years.  Defendants respond that Plaintiff is incorrect, and DAC did have a use-of-force policy in place at the time that reflected the correct legal standard.  Defendants thus contend they are entitled to summary judgment on Plaintiff's *Monell* claim.

As explained *supra*, neither party met the evidentiary standards for authenticating each party's respective exhibit purportedly showing what the use-of-force policy was at the time.  This Court therefore does not have evidence before it of whether there was a use-of-force policy in place at the time, and if so, whether the written policy was constitutional.  It is Defendants' burden to prove that they are entitled to judgment as a matter of law, and Defendants have not done so.  The

Court will therefore deny Defendant DAC's motion for summary judgment on Plaintiff's *Monell* claim at this time.

**2.      Deliberate Indifference Claim against Sheriff Garrison**

The Tenth Circuit has held that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)).  In 2009, the Supreme Court made clear that there is no respondeat superior liability under § 1983: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  The Supreme Court explained: "In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677.

Defendants argue that the Supreme Court in *Iqbal* eliminated Section 1983 supervisory liability altogether.  The Tenth Circuit, however, explained in *Dodds*, that "[w]hatever else can be said about *Iqbal*," at least one form of liability against defendant-supervisors survives:

> A plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

Plaintiff asserts that Sheriff Garrison was a supervisor and policymaker responsible for the DACSO's policies and procedures, and thus, personally involved with and affirmatively linked to the deliberate indifference in failing to promulgate use-of-force procedures for at least five years

33

leading up to Mr. Dominguez's death.  Defendants contend that they are entitled to summary judgment on this claim because there was, in fact, a constitutionally adequate use-of-force policy in place at the time. The Court, however, cannot grant Defendant Garrison summary judgment on this claim for the same reason it could not grant Defendant DAC's request – the Court has no authenticated documents in the record, nor other evidence, to establish for a fact whether there was a constitutionally adequate use-of-force policy in place at the time of the incident.[10]

### C.    State Tort Claims against Defendant Barrientos (Count III) and Defendant Doña Ana County (Count V)[11]

#### 1.    Assault and Battery

Defendants Barrientos and Doña Ana County argue that, because Deputy Barrientos's actions were objectively reasonable, Plaintiff cannot succeed on her state law assault, battery, and wrongful death claims.  It is unclear whether the doctrine of qualified immunity, as defined in federal law, applies to state tort claims brought under the New Mexico Tort Claims Act ("NMTCA"), N.M. Stat. Ann. 1978, § 41-4-1, *et seq.  See Romero v. Sanchez*, 119 N.M. 690, 696 (1995) ("question[ing] the parties' assumption" that qualified immunity applies to actions brought under NMTCA and noting that it "is an open question," but declining to address issue because it had

---

[10]Defendants presented evidence that the DACSO had no specific policies regarding securing firearms in police vehicles, locking police vehicles, and approaching intoxicated subjects.  It does not appear that Plaintiff bases her supervisory liability claim on the lack of any such policies.  In any event, reliance on such a theory would fail because Plaintiff could not demonstrate that those policies, or lack thereof, caused the constitutional harm.  This Court has already ruled that Deputy Barrientos acted objectively reasonably in firing the initial shot and that leaving his vehicle and long guns unsecured did not amount to reckless or deliberate conduct.  Those policies are irrelevant to the theory of excessive force that survives – whether shooting Mr. Dominguez multiple times, after he had already slumped over from the initial shot, was justified.

[11]There is no Count IV in Plaintiff's complaint.

34

not been raised by parties).  However, the New Mexico courts appear to apply a similar doctrine regarding the use of deadly force by police officers in state tort actions under the NMTCA.  *See State v. Mantelli*, 2002-NMCA-033, ¶¶ 28-29, 131 N.M. 692 (explaining that, in tort actions brought under § 1983 and the NMTCA, the reasonableness of the use of deadly force by police officers is an objective test from perspective of officer on scene, with understanding that officers must often make split-second decisions in difficult situations about what force is necessary) (quoting *Archuleta v. LaCuesta*, 1999-NMCA-113, ¶ 8, 128 N.M. 13).

An officer is permitted a privilege under New Mexico law, and will not be civilly liable, if the officer acts with a reasonable belief that the amount of force used is necessary under the circumstances.  *Beldsoe v. Garcia*, 742 F.2d 1237, 1240 (10th Cir. 1984) (citing Restatement (Second) of Torts § 132)); *Mead v. O'Connor*, 66 N.M. 170, 173 (1959).  "Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace."  *Mead*, 66 N.M. at 173.  "When acting in good faith, the courts will afford them the utmost protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court."  *Id.*  Under New Mexico law, then, an officer or entity may successfully defend against a charge of battery by demonstrating that (1) the officer used no more force than reasonably was necessary, and (2) the officer acted in good faith.  *See id.*[12]  Generally, the question of the reasonableness of the officer's actions in using lethal force to apprehend a felon is a question of fact for the jury.  *Alaniz v. Funk*, 69 N.M. 164, 167 (1961), *limitation of holding on*

---

[12]*See also* N.M. Stat. Ann. 1978, § 30-2-6(B) ("[H]omicide is necessarily committed when a public officer . . . has probable cause to believe he or another is threatened with serious harm or deadly force while performing those lawful duties described in this section. Whenever feasible, a public officer or employee should give warning prior to using deadly force.").

*other grounds recognized by State v. Johnson*, 124 N.M. 647, 649 (Ct. App. 1997). New Mexico courts, however, have demonstrated a willingness to grant summary judgment to police officers when the facts show that they acted reasonably under the circumstances. *See, e.g., Alaniz*, 69 N.M. at 167-68 (holding that, where record indicated that reasonable minds of jury could not but agree that officer acted reasonably in attempting to apprehend felon, directed verdict was appropriate).

For the same reasons given *supra* in Section A, the Court only concludes as a matter of law that Deputy Barrientos's actions were reasonable and necessary as to his firing of the initial shot. Genuine issues of material fact, however, preclude the Court from granting summary judgment to Defendants on Plaintiff's claims for assault and battery because there are questions of fact regarding the reasonableness and necessity of the additional shots fired.

### 2. Negligence

In paragraph 26 of Plaintiff's complaint, she alleges: "If the above-described actions of Defendant Barrientos were not reckless, intentional, or undertaken with deliberate indifference, they were negligent and such negligence resulted in battery." (Compl. (Doc. 1-1).) Contrary to Plaintiff's argument, Section 41-4-12 of the NMTCA does not waive a law enforcement officer's immunity in an action for negligence standing alone. *Dickson v. City of Clovis*, 2010-NMCA-058, ¶ 19, 148 N.M. 831. Immunity is waived for negligence under Section 41-4-12 only if the negligence caused an enumerated tort or violation of rights. *Id.* ¶ 18 (quoting *Lessen v. City of Albuquerque*, 2008-NMCA-085, ¶ 35, 144 N.M. 314). However, "allegations of negligence based on one of the torts specified in Section 41-4-12 are appropriate only when a law enforcement officer's negligence allegedly caused a third party to commit one of the enumerated intentional acts." *Id.* ¶ 20. Plaintiff's negligence claim fails because it is based on a theory in which Deputy Barrientos's alleged negligence caused himself, not a third party, to commit a battery. Defendants

36

Barrientos and Doña Ana County are therefore entitled to summary judgment on Plaintiff's negligence claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and Memorandum in Support of (**Doc. 47**) is **GRANTED** in part and **DENIED** in part as follows:

1.      Defendant Barrientos's request for qualified immunity and summary judgment on Plaintiff's § 1983 excessive force claim (Count I) is **GRANTED** to the extent the claim arises from Defendant Barrientos's actions in firing the initial shot at Nick Dominguez but is **DENIED** to the extent the claim arises from Defendant Barrientos's actions in firing the additional shots at Nick Dominguez;

2.      Defendants Garrison and Doña Ana County's requests for summary judgment on Plaintiff's § 1983 claims against them (Count II) are **DENIED**;

3.      Defendant Barrientos's and Defendant Doña Ana County's requests for summary judgment on Plaintiff's assault and battery claims against them (Counts III and V, respectively) are **GRANTED** to the extent the claims arise from Deputy Barrientos's actions in firing the initial shot at Nick Dominguez but are **DENIED** to the extent the claims arise from his actions in firing the additional shots at Nick Dominguez;

4.      Defendant Barrientos's and Doña Ana County's requests for summary judgment on Plaintiff's negligence claims against them (Counts III and V, respectively) are **GRANTED**;

5.      Plaintiff's negligence claims are hereby **DISMISSED WITH PREJUDICE**;

6.      All other claims remain in the case.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**

37