## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

LUCIA FANCHER, individually and
as personal representative of the
ESTATE OF NICK DOMINGUEZ,

      Plaintiff,

v.                              No. Civ. 11-118 LH/LAM

JOHNNY BARRIENTOS, in his individual capacity,
SHERIFF TODD GARRISON, in his individual and
official capacity, and the COUNTY OF DOÑA ANA,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On October 10, 2013, Plaintiff Lucia Fancher, individually and as the personal representative of the estate of Nick Dominguez, ("Plaintiff") filed a Motion to Partially Exclude the Testimony of Vincent Di Maio (ECF No. 102) ("Motion to Exclude") on grounds of judicial estoppel and the lack of reliable methodology under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court, having considered the motion, briefs, pleadings, evidence, relevant law, and otherwise being fully advised, rejects the arguments that Dr. Vincent Di Maio's opinion on the sequence of gunshots should be excluded based on untimeliness and judicial estoppel theories. However, the Court concludes that a pre-trial *Daubert* hearing is necessary as to the issue of the reliability of Dr. Di Maio's testimony regarding the sequence of gunshots. The Court will therefore **reserve ruling** on the admissibility of Dr. Di Maio's opinion until after the hearing.

## I.    INTRODUCTION

This case arises from a March 29, 2010 deadly shooting. After the decedent, Nick

Dominguez, attempted to disarm Deputy Johnny Barrientos, at which time Deputy Barrientos's firearm discharged, Mr. Dominguez ran to and attempted to start driving Deputy Barrientos's squad car where two unsecured, loaded long guns were located.  Deputy Barrientos struggled with Mr. Dominguez for control of the squad car, and when Mr. Dominguez shifted the car in reverse, Deputy Barrientos shot Mr. Dominguez multiple times.  On behalf of Mr. Dominguez's estate, Plaintiff Lucia Fancher filed suit against Deputy Barrientos, Sheriff Todd Garrison, and Doña Ana County ("Defendants") for excessive force and failure to train under 42 U.S.C. § 1983 and for various state law claims.

## II.   PROCEDURAL HISTORY

On November 23, 2011, Defendants filed a motion for summary judgment based on qualified immunity.  Defs.' Mot. for Summ. J., ECF No. 47.  Among other facts set forth to support their motion, Defendants relied in part on the fact that, at the time of the initial shot, Deputy Barrientos felt pressure on his left shoulder after Mr. Dominguez put the vehicle in reverse.  *See id.* at 7.  Defendants argued that Deputy Barrientos was entitled to qualified immunity based on the totality of circumstances, including that Mr. Dominguez attacked Deputy Barrientos, tried to get the firearm causing it to discharge, and actively resisted arrest.  *See id.* at 13-15.  Defendants asserted that Deputy Barrientos was justified in using deadly force to prevent Mr. Dominguez's escape in the police vehicle containing the high-powered weapons "even before he perceived that Dominguez was trying to drag or crush him with that vehicle."  *Id.* at 15.  Additionally, Defendants argued that Deputy Barrientos lawfully used deadly force when he did because, after feeling pressure on his left shoulder from the vehicle while he was leaning inside the open window, he believed Mr. Dominguez intended to drag or crush him with the vehicle.  *See id.*

On June 13, 2012, this Court filed its Memorandum Opinion and Order (ECF No. 68), setting forth the facts of the incident in the light most favorable to Plaintiff. The following facts are relevant to the current motion:

> Deputy Barrientos quickly approached the patrol vehicle and, with his duty weapon in his right hand, tried to remove the ignition keys with his left hand while shouting at Mr. Dominguez to stop and get out of the vehicle. Mr. Dominguez pushed Deputy Barrientos's left hand away, resisting his attempt to remove the ignition keys. The engine was racing. As Deputy Barrientos struggled to remove the ignition keys, Mr. Dominguez shifted the patrol vehicle into reverse.

> Deputy Barrientos fired his duty weapon at Mr. Dominguez's center mass, or chest area. He began firing his weapon before the vehicle started going backwards. Deputy Barrientos was sure that he had hit Mr. Dominguez with the initial shot to the chest because he saw him slump.

> After firing his weapon, the car began to press up against his shoulder. He could feel the car pushing him away and turning him to the right. Deputy Barrientos testified that he took two or three steps away from the car after the first shot. He testified that he felt safer after he backed away from the vehicle. The squad car continued to move in reverse, away from Deputy Barrientos. He nevertheless continued shooting at Mr. Dominguez after he had moved backwards those two to three steps, even though he did not at that time have any indication that Mr. Dominguez was armed.

Mem. Op. and Order 6-8, ECF No. 68 (internal citations and footnote omitted).

After analyzing the facts and law, this Court granted qualified immunity to Defendant Barrientos for his actions in firing the initial shot. The Court reasoned:

> Deputy Barrientos's action in firing the initial shot was reasonable, even if mistaken. Deputy Barrientos had just been attacked by Mr. Dominguez. Deputy Barrientos knew that Mr. Dominguez had committed numerous violent felonies in attacking him, resulting in the discharge of the firearm that could have severely harmed or killed Deputy Barrientos or other bystanders. Mr. Dominguez was actively resisting arrest and attempting to evade arrest by flight. He was attempting to use the deputy's own vehicle, which contained loaded weapons, as his mode of evading arrest. Deputy Barrientos repeatedly issued commands for Mr. Dominguez to stop and get out of the vehicle. Mr. Dominguez refused to comply and instead continued revving the engine and trying to get the vehicle into gear. Deputy Barrientos and Mr. Dominguez were in close proximity to one another as they physically struggled for the keys in the ignition. Mr. Dominguez

had just succeeded in getting the vehicle into gear while Deputy Barrientos's arm was still in the car. Thus, Deputy Barrientos, when he fired the first shot, could reasonably fear for his personal safety from Mr. Dominguez quickly accelerating the vehicle.

The Court recognizes that, at this point, the evidence in Plaintiff's favor shows that Mr. Dominguez was not reaching for the guns, the car was not yet moving, and Deputy Barrientos's body, other than his arm, was to the side of the police car, not in the car's direct path. Those facts alone, however, are insufficient to establish that Deputy Barrientos acted unreasonably where he had many other reasons to believe a threat to his safety existed, based on the recent attack by Mr. Dominguez and Mr. Dominguez's constructive possession of the police car and firearms. *Cf. Thomas* [*v. Durastanti*], 607 F.3d [655,] 666 [(10th Cir. 2010)] (agent's action reasonable, even though at time he fired second volley of shots, Lincoln was driving away from him); *Phillips v. James*, 422 F.3d 1075, 1083-84 (10th Cir. 2005) (holding that officer's decision to shoot suspect who had barricaded himself in his home with weapons was reasonable, and that officer did not have to wait to be shot at or even to see suspect raise gun and point it at person, where suspect was acting irrationally, refusing to defuse situation, continually threatened officers with harm, and just exclaimed that he had a clean shot at officer); *Robinson v. Arrugueta*, 415 F.3d 1252, 1254-56 (11th Cir. 2005) (holding that officer did not violate Fourth Amendment in using deadly force against suspect who defied officer's order to raise hands and instead grinned as car slowly began to move forward at speed of one to two miles per hour toward officer who was standing only two to four feet from vehicle in narrow space, because even if in hindsight facts showed that officer perhaps could have escaped unharmed, a reasonable officer could have perceived that suspect was using car as deadly weapon).

. . . . Deputy Barrientos was in a very vulnerable position. Mr. Dominguez fled towards the police vehicle that contained loaded weapons. At the time of the initial shot, Mr. Dominguez had just gotten the car into gear and the deputy's arm was still in harm's way. Moreover, Deputy Barrientos would not have known if Mr. Dominguez intended to continue going in reverse and escaping, or whether he, after getting clear from Deputy Barrientos's attempts to remove the keys, may have altered course and used the car to run down Deputy Barrientos. While, again, Plaintiff contends that Deputy Barrientos could have waited to find out if Mr. Dominguez intended to use the car as a weapon, Deputy Barrientos would have been in an exposed position had Mr. Dominguez used the guns in the vehicle against him instead. Mr. Dominguez's decision to take control of the police car, instead of fleeing on foot, escalated the danger to Deputy Barrientos and made it reasonable for him to believe that Mr. Dominguez intended to harm him, and not merely escape. This was a split-second decision concerning the use of deadly force under hardly ideal circumstances. . . .

Furthermore, aside from the danger presented to Deputy Barrientos, a

> reasonable officer could have believed that, even if Mr. Dominguez's intent was to escape in the police car, Mr. Dominguez presented a danger to the public at large and to other officers, who undoubtedly would have attempted a pursuit of Mr. Dominguez. The facts here are even more compelling than in *Thomas*. Deputy Barrientos had probable cause to believe Mr. Dominguez had been consuming alcohol, and he knew that Mr. Dominguez was acting erratically, had assaulted an officer and attempted to take his gun, was refusing to obey commands to stop, was resisting arrest, and was attempting to steal a police vehicle where he had access to long guns in the cab. These factors set the stage for a potentially highly dangerous chase that could endanger the motoring public. A reasonable officer in Deputy Barrientos's position could conclude that Mr. Dominguez was a dangerous fleeing felon justifying the use of deadly force.

Mem. Op. and Order 19-21, ECF No. 68.

The Court also distinguished the case of *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), relied upon by Plaintiff:

> The Tenth Circuit explained that, just because a situation may justify ramming a vehicle, which is likely to cause serious injury or death, this does not mean that shooting a suspect in the head, which is almost certainly likely to result in death, is justified. *See* [*Cordova*, 569 F.3d] at 1189. "When an officer employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving." *Id.* at 1190. . . .
>
> Contrary to Plaintiff's argument, the *Cordova* case does not establish that Deputy Barrientos is not entitled to qualified immunity for his initial shot. Although an officer could conclude that death was nearly certain to occur from shooting Mr. Dominguez in the chest at close range, unlike in *Cordova*, this case involves more than merely the general, uncertain risk of reckless driving posed to a motoring public. Indeed, the *Cordova* court conceded that if a reasonable officer could have feared for his life or those of other officers, those facts could shift the calculus. *See id.* That is the case here. As explained above, Deputy Barrientos had just been attacked by Mr. Dominguez and had physically struggled for control of his duty weapon, which discharged in the process. Deputy Barrientos thus had probable cause to believe that Mr. Dominguez would harm him in an attempt to escape. *Mr. Dominguez, at the time of the initial shot, had gained control of the police car while Deputy Barrientos's arm was in the vehicle. Deputy Barrientos had an imminent reason to fear for his personal safety if Mr. Dominguez accelerated rapidly at that moment. In addition, Mr. Dominguez had constructive possession of the loaded weapons inside.* Deputy Barrientos had no way of knowing if Mr. Dominguez merely intended to flee or if he intended, once beyond Deputy Barrientos's reach, to use the vehicle and/or guns against him. Although there were no pedestrians or officers directly behind the police car and the car was currently alongside an irrigation ditch, and not on a busy street, they were near

5

Highway 192, the Mercantile, and other residences. There were also innocent bystanders nearby: Mr. Ceniceros, Ms. Gonzalez, and Mr. Herrera. Mr. Dominguez, in struggling for a firearm that discharged near the other citizens, had shown a complete disregard to innocent bystanders. Deputy Barrientos had probable cause to believe a chase would have ensued had Mr. Dominguez sped away. Deputy Barrientos had already requested back-up. *He had reason to fear for the safety of the pursuing officers, given that Mr. Dominguez had shown a willingness to attack an officer to aid in an escape and to use a firearm.* Mr. Dominguez had placed Deputy Barrientos in a vulnerable position in which he had only moments to judge the danger to himself and others and to react accordingly. Unlike in *Cordova*, the degree of risk to Deputy Barrientos was both imminent and substantial; and the risk to other officers and innocent bystanders, while perhaps not as imminent, was also substantial.

Mem. Op. and Order 24-26, ECF No. 68 (emphasis added).

The Court, however, denied Defendants' request for qualified immunity for Deputy Barrientos's actions in firing the remaining shots at Mr. Dominguez because Deputy Barrientos testified that after the first shot, he stepped backwards, saw Mr. Dominguez slump, and felt safer. *Id.* at 30. This Court explained: "There is thus a question of fact as to whether, under the totality of circumstances, Deputy Barrientos reasonably perceived that he or others were in danger at the precise moments that he fired shots two through seven, and thus, whether those additional shots were excessive." *Id.* The Court further determined that a question of fact existed as to which shot killed Mr. Dominguez. *Id.* at 30-31.[1]

Defendants appealed this Court's denial of qualified immunity to the Tenth Circuit Court of Appeals. *See* Notice of Appeal, ECF No. 71. Defendants argued that this Court erred in (1) analyzing the second through seventh shots separately from the first shot; (2) insufficiently considering the risks posed to third parties in analyzing the reasonableness of shots two through seven; and (3) concluding that Deputy Barrientos was not entitled to qualified immunity with

---

[1] According to the Autopsy Report written by Dr. Michelle Aurelius, a total of six shots actually hit Mr. Dominguez: four were through-and-through gunshot wounds (left head, left arm, right chest, right arm), one was a graze wound (right arm), and one entered the left chest with a missile recovered in the back. Pl.'s Ex. 8 at 1, 9, ECF No. 57-2.

respect to shots two through seven based on the clearly established law. *See Fancher v. Barrientos*, 723 F.3d 1191, 1193-94 (10th Cir. 2013). The Tenth Circuit concluded it lacked jurisdiction to consider Defendants' first two arguments and was not persuaded by the third argument, thus affirming this Court's ruling and remanding the case. *See id.* at 1194.

On September 4, 2013, United States Magistrate Judge Lourdes A. Martinez held a status conference during which the parties said that they were scheduling the deposition of the pathologist. *See* Clerk's Minutes 1, ECF No. 90. Defense counsel stated that, depending on what the pathologist said, he may need to retain another expert. *Id.* Plaintiff's counsel stated that, if Defendants retained a new expert, he would want to depose that expert to determine if he would need a rebuttal expert. *Id.* at 2.

The parties deposed the pathologist, Dr. Michelle B. Aurelius, on September 17, 2013. *See* Pl.'s Mot. to Exclude, Ex. D, ECF No. 102-2 at 1 of 7. Dr. Aurelius testified that she told Plaintiffs' counsel in a prior interview that she could not give an opinion, based on the autopsy, as to which shot was fired when. *See id.*, Ex. D, ECF No. 102-2 at 2 of 7. Dr. Aurelius opined, however, that wound C "could be a fatal shot." Defs.' Resp., Ex. B at 14, ECF No. 107-2. Dr. Aurelius testified that the bullet causing gunshot wound C, among other things, went through Mr. Dominguez's left ribs, the right ventricle of his heart, the right diaphragm, the liver, the stomach, multiple loops of his intestine, and muscle. *See id.*, Ex. B at 13-14, ECF No. 107-2. She noted that if a person with wound C were shot in the operating room, a surgeon may have been able to save him but that she has also seen individuals with a gunshot wound of the chest that went through the heart that alone killed them. *See id.*, Ex. B at 14, ECF No. 107-2. Dr. Aurelius testified that, based on the area of stippling[2] around gunshot wound C to the left chest

---

[2] According to Dr. Aurelius, stippling "occurs from the impact of burned and unburned

and the absence of visible soot, wound C was caused by an intermediate range of fire. *See id.*, Ex. B at 12-13, ECF No. 107-2. Dr. Aurelius described an intermediate range of fire as between six to 16 inches and opined that the shot that caused wound C was fired from six to 16 inches away. *See id.*, Ex. B at 34-37, ECF No. 107-2.

Dr. Aurelius also testified about wound D, the other chest shot Mr. Dominguez suffered on the right-side of his chest. *See id.*, Ex. B at 38-39, ECF No. 107-2. She stated that wound D was of indeterminate, i.e. unknown, distance. *See id.*, Ex. B at 37-39, ECF No. 107-2. She explained that the uncertainty was because wound D had an irregular entrance and because, even though there was no soot, there was some stippling adjacent to the entrance of wound D. *See id.* She testified that she could not assign the stippling to the gunshot that caused wound D, as it could also be a continuation of the stippling that extended from entrance wound C. *See id.* The irregular shape of entrance wound D could be because the bullet first went through another object, such as the car door or his arm, or because the bullet entered at an angle. *See id.*, Ex. B at 39, ECF No. 107-2. Dr. Aurelius said that she could not say whether C was fired from a closer distance than D. *See id.*, Ex. B at 41, ECF No. 107-2.

Judge Martinez held another status conference on September 18, 2013. *See* Clerk's Minutes 1, ECF No. 93. The parties advised the Court that they had taken the pathologist's deposition, and defense counsel stated that he would be retaining Dr. Vincent Di Maio as a pathologist expert. *See id.* Plaintiff's counsel stated that he was opposed to naming new experts and re-opening discovery at this late date. *See id.* Defense counsel responded that Plaintiff had

---

gunpowder particles that come out of the end of a firearm and impact the skin and sometimes fall off, sometimes stay there and cause injury on the skin." Defs.' Resp., Ex. B at 25-26, ECF No. 107-2. Dr. Aurelius testified that stippling "can be used to estimate a range of fire, which is the distance between the end of . . . the barrel of a gun and the decedent's skin," and that a subcategory of stippling called pseudostippling can be caused by an intermediary object, such as a fence, door, or glass. *Id.*, Ex. B at 33, ECF No. 107-2.

not opposed the scheduling of the pathologist's deposition and did not object at the last status conference to re-opening discovery on this issue. *See id.* After further discussion with the parties and after the Court refreshed the parties' memories as to what occurred at the last hearing, Plaintiff's counsel agreed to withdraw his objection to Defendants naming an expert and reopening discovery. *See id.* at 1-2. The Court set deadlines for Defendants' expert disclosures and gave Plaintiff the option of naming a rebuttal expert pathologist on the condition it was done by specifically set deadlines. *See id. See also* Order 1, ECF No. 94 ("The parties agreed that Defendants will be allowed to name an expert pathologist, even though discovery and expert deadlines have passed, and Plaintiff does not object on the condition that Defendants' expert provides a written report by September 30, 2013 and makes himself available for a deposition no later than October 4, 2013. Plaintiff will have the option of naming a rebuttal expert pathologist on the condition that Plaintiff provides the expert report by October 30, 2013 and the expert makes himself available for a deposition by November 6, 2013.").

On September 30, 2013, Dr. Di Maio, a Board Certified Physician in Anatomical, Clinical and Forensic Pathology, provided his report to defense counsel. *See* Pl.'s Mot. to Exclude, Ex. E, Doc. 102-2 at 3, 7 of 7. In his report, Dr. Di Maio states that he reviewed the following materials: (1) the autopsy report; (2) the toxicology report; (3) photographs of the body at the morgue and scene; (4) photographs of the scene, weapons, Deputy Barrientos, and the vehicle; (5) power point presentation constructed by the police; and (6) this Court's Memorandum Opinion and Order. *Id.*, Ex. E, Doc. 102-2 at 3 of 7. Dr. Maio opined in his report as follows:

> The most significant wound was the entrance wound of the left chest designated as **C**. . . . The tattoo marks are extremely fine suggestive of ball powder tattooing. There is some associated powder tattooing of the ventral aspects of the upper arms. This was due to the hands being on the wheel, positioning the upper arms

in the trajectory of the powder that came from the muzzle of the gun and impacted the chest.

The bullet fractured the 3-5 left ribs; the right ventricle of the heart; the stomach; liver; small bowel and 11th intercostal space coming to rest in the muscle of the right back. . . .  The path of the bullet was from left to right; front to back and sharply downward.

Wound **C** was the fatal wound and in all medical probability was the first shot fired.  This is based on the account of the shooting; the powder tattooing and the trajectory of the bullet path.  The range of the shooting was somewhere around 2-3 feet.  It was definitely less than four feet.  Ball powder tattooing extends to at most 4 feet.

. . .

None of the other wounds showed evidence of close range firing.  In other words they were inflicted at a range of greater than 4 feet.

Gunshot wound **A** was second in severity but this is academic in that death was due to wound **C**.  With proper medical treatment, this wound would not have been fatal.  There was no evidence of close range firing.[3]

Wound **D** was an elongated, tangential, superficial perforating wound that entered the front of the right chest and exited the right side of the chest.  Injury was confined to muscle and this was not a fatal wound.  There is no evidence of close range firing.  The powder tattooing of the right chest is medial to this wound.  The tattooing terminates prior to the origin of the wound and is associated with wound **C**.

Wound **J** was a perforating wound of the left upper arm.  There was no evidence of close range firing associated with it.  The exiting bullet most likely produced the perforating wound of the right upper arm (**F**) in view of the size of entrance **F** and associated satellite wounds.  **F** and **J** were non-fatal wounds.

**G** was just a graze wound.[4]

. . .

In conclusion, it is my opinion that Nick Cody Dominguez . . . died as a result of a

---

[3] Although not described in Dr. Maio's report, according to Dr. Aurelius's Autopsy Report, gunshot wound A entered Mr. Dominguez's head – anterior to the left ear, 8 inches below the crown of the head.  *See* Pl.'s Ex. 8 at 2, ECF No. 57-2.

[4] Dr. Aurelius's Autopsy Report describes wound G as a graze wound of the right medial upper arm.  *See* Pl.'s Ex. 8 at 4, ECF No. 57-2.

gunshot wound of the heart.  The entrance, designated **C**, was in the left chest.
The wound was inflicted at close range, 2-3 feet, as indicated by the powder
tattooing.  Based on the position of the shooter, the steep downward trajectory of
the bullet, and the left to right path, it is my opinion that in all medical
probability, this was the first shot.

*Id.*, Ex. E, ECF No. 102-2 at 6-7 of 7 (bold in original, footnotes added).

The parties deposed Dr. Di Maio on October 1, 2013.  *See* Pl.'s Mot. to Exclude, Ex. F,
ECF No. 102-3.  Dr. Di Maio stated that the items most important for his opinion were the
autopsy report, the autopsy photographs, and the diagrams of the scene.  Defs.' Resp., Ex. E at
14-15, ECF No. 107-5.  Dr. Di Maio did not review any statement of Deputy Barrientos when
forming his opinion, because he believes the physical evidence is the most objective evidence.
*See id.*, Ex. E at 15-17, ECF No. 107-5.

Dr. Di Maio testified, based on the physical evidence, that Deputy Barrientos fired the
first shot when he was in the area of the side mirror.  *See* Pl.'s Mot. to Exclude, Ex. F at 8, ECF
No. 102-3.  He described it as "an immediate range gunshot wound by virtue of the fact that
powder tattooing was present."  *Id.*, Ex. F at 9, ECF No. 102-3.  Dr. Di Maio believes that wound
C is the first and closest shot fired, based on the extensive tattooing around wound C, the
downward trajectory of the bullet, and the police investigation that showed the car moving in
reverse in an arc and the shell casings also located in an arc.  *See* Defs.' Resp., Ex. A at 11-12,
ECF No. 107-1.[5]

Dr. Di Maio stated that there are no wounds that correspond to Deputy Barrientos firing a
shot "when he's in the car at the time he's pulling the trigger."  Pl.'s Mot., Ex. F at 30-31, ECF

---

[5] New Mexico State Police Agent Norman Rhoades created crime scene diagrams based on the
evidence at the crime scene and Deputy Barrientos's initial statements.  Mem. Op. and Order 9,
ECF No. 68.  The crime scene evidence included the trajectory of the bullet holes through the car
and body and the position of the shell casings found on the ground.  *See* Pl.'s Ex. 13 at 34-35,
ECF No. 57-7.

No. 102-3.  He further explained:

> Now, the muzzle of his gun could have been close to the window.  And he also
> mentions the car starts moving about that time.  So he could have been in, and
> then the car went back, and then he pulled the trigger.  But he was out.  He was
> not in the cabin of the car when he pulled the trigger.

*Id.*, Ex. F at 31, ECF No. 102-3.

Plaintiff's counsel also asked Dr. Di Maio about Deputy Barrientos's position as depicted in a diagram referred to as Exhibit 4.  Defs.' Resp., Ex. F at 31, ECF No. 107-6.  Deputy Barrientos had testified that Exhibit 4 accurately represented where he was and where the car was at the time of the first shot.  Pl.'s Mot. to Exclude, Ex. B at 123, 165-66, ECF No. 102-1. Exhibit 4 depicts Deputy Barrientos's head and body from above the waist as being inside the vehicle at the time of the first shot.  *See* Pl.'s Mot. to Exclude 3, ECF No. 102; Pl.'s Mot. to Exclude, Ex. C, ECF No. 102-1 at 7 of 7.  When counsel asked Dr. Maio about Exhibit 4 and whether it accurately depicted the position Deputy Barrientos would have been in when the first shot was fired, Dr. Di Maio replied that there is no gunshot wound that would correspond to this position.  Defs.' Resp., Ex. F at 31, ECF No. 107-6.  Dr. Di Maio provided further insight into the purported discrepancy:

> It takes about .3 to .4 seconds to actually shoot the gun.
>
> Now, that doesn't sound like much, but actually in .3 to .4 seconds you
> can turn 90 degrees, and so, you know, he could have decided to shoot.  The car
> could have backed up, or he could have pulled back unconsciously when he went
> to fire.
>
> And so to him, it would appear like he was shot when he was going in
> there.  That's when he decided to shoot, and when – it didn't happen that way. . . .
>
> . . . [W]hat he says is that he's leaning in the car trying to get him, and then he
> decides to shoot, and *then he says at that time the car began to move backwards,
> and if it moved backwards, the car would then hit his chest.*
>
> . . . . We're talking about a time interval of less than half a second where he may

have been in and then out and pulling the trigger, and the car was moving, and that for him to give – that's why you look at the physical evidence.

*Id.*, Ex. F at 35-37, ECF No. 107-6 (emphasis added).  The following exchange then occurred:

Q.  And the physical evidence would say that there was no way that . . . Deputy Barrientos felt the vehicle pushing against his left arm after he fired the first shot because when he fired the first shot –
A.  He was already out, right.  Yes.
Q.  So that would be another thing that Deputy Barrientos is wrong about?
A.  Right, mistaken, right.

*Id.*, Ex. F at 37, ECF No. 107-6.

Following the deposition, on October 10, 2013, Plaintiff filed a motion to partially exclude Dr. Di Maio's testimony (ECF No. 102).  Plaintiff argues that judicial estoppel precludes Dr. Di Maio from offering testimony that is inconsistent with Deputy Barrientos's account that his arm was inside the vehicle at the time of the initial shot.  Plaintiff contends that because this Court relied on the fact that Deputy Barrientos's arm was inside the vehicle when granting him qualified immunity as to the first shot, judicial estoppel prevents Deputy Barrientos from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.  Second, Plaintiff asserts that Dr. Di Maio's testimony that the first shot fired caused wound C is not supported by reliable methodology and must be excluded under *Daubert*.  Finally, Plaintiff contends that Dr. Di Maio's testimony regarding the sequence of the shots fired should be excluded because it is not responsive to Dr. Aurelius's testimony.  Plaintiff argues that counsel did not object to deposing Dr. Di Maio because he believed any such expert would only be used to opine on the matters to which Dr. Aurelius rendered an opinion.  Plaintiff asserts that, because Dr. Di Maio's testimony on the sequence of shots is outside the scope of Dr. Aurelius's report and testimony, it is an untimely disclosure of expert testimony.

## III.    ANALYSIS

**A.    Timeliness**

At the September 4, 2013 status conference, Plaintiff did not object to reopening discovery to depose Dr. Aurelius, and Plaintiff stated that, if Defendants retained a new expert, Plaintiff would want to depose that expert to determine whether Plaintiff would need a rebuttal expert.   At the September 18, 2013 status conference, after initially objecting to further depositions, Plaintiff ultimately agreed to withdraw the objection to Defendants naming an expert and reopening discovery.   The Court thus set deadlines for naming and deposing the parties' respective experts.

In light of her representations at the status conferences, Plaintiff has waived her objection to the untimeliness of Dr. Di Maio's report and testimony.   Plaintiff contends that she did not initially object because she did not anticipate that Dr. Di Maio would opine on the sequence of shots, given that Dr. Aurelius stated she could not render an opinion on the timing of shots based on the autopsy.   After this Court issued its June 13, 2012 Memorandum Opinion and Order, however, it should have been foreseeable to Plaintiff that Defendants' desire to re-open discovery in order to depose pathology experts was because of the importance of the issue as to whether the first shot was the cause of death.   The Court therefore concludes that Plaintiff waived her timeliness objection when she agreed to re-open discovery and depose Dr. Aurelius and Dr. Di Maio.

**B.    Judicial Estoppel**

Judicial estoppel is an equitable doctrine that prevents a party prevailing in one phase of a case on an argument from relying on a contradictory argument to prevail in another phase.   *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211,

227, n.8 (2000)).  Because the rule is designed to protect the integrity of the judicial process, a court may invoke the doctrine at its discretion.  *See id.* at 749-50.  When determining whether judicial estoppel applies, a court may examine the following non-exhaustive list of factors that "typically inform the decision whether to apply the doctrine in a particular case:" (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position so that judicial acceptance of the inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *Id.* at 750-51.  "Moreover, the position to be estopped must generally be one of fact rather than of law or legal theory."  *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005).  Judicial estoppel must be applied narrowly and cautiously.  *Bradford v. Wiggins*, 516 F.3d 1189, 1194 & n.3 (10th Cir. 2008).

This Court is not convinced that the doctrine of judicial estoppel applies here because Plaintiff has not shown that the relevant testimony of Dr. Di Maio is "clearly inconsistent" with the facts upon which this Court previously relied.  Dr. Di Maio opines that wound C was caused by a gunshot fired from a distance of 2-4 feet away from Mr. Dominguez.  Dr. Di Maio contends that wound C was the first shot fired, in part, because wound C is the only wound with evidence of close or intermediate range firing of 2-4 feet.  Plaintiff's judicial estoppel argument requires that Dr. Di Maio's 2-4 foot estimate necessarily places Deputy Barrientos's left arm outside the

vehicle, because this Court relied in its prior Memorandum Opinion and Order on the fact that Deputy Barrientos's left arm was in the vehicle.[6]

Some of Dr. Di Maio's testimony indicates a possible inconsistency with Defendants' prior factual position that Deputy Barrientos's left arm was inside the vehicle at the time of the first shot. In his deposition testimony, Dr. Di Maio states that Exhibit 4 is not supported by the physical evidence, that Deputy Barrientos was already out of the vehicle at the time of the initial shot, and that Deputy Barrientos was wrong when he says he felt the vehicle pushing against his left arm after he fired the first shot. *See* Pl.'s Mot. to Exclude, Ex. F at 30-37, ECF No. 102-3. While those portions of Dr. Di Maio's testimony lend support to Plaintiff's position that Dr. Di Maio believes that all of Deputy Barrientos was outside the vehicle at the time of the first shot, other portions of his testimony cast doubt on the clear inconsistency necessary to apply judicial estoppel.

Significantly, Dr. Di Maio also testified that "*the muzzle of his gun could have been close to the window*. . . . So he could have been in, and then the car went back, and then he pulled the trigger. But he was out. He was not in the cabin of the car when he pulled the trigger." *Id.*, Ex. F at 31, ECF No. 102-3 (emphasis added). If the muzzle of the gun were near the window when it fired, that could be consistent with Deputy Barrientos's left arm still being partially inside the vehicle, if Deputy Barrientos's right arm was pulled back toward his body while his left arm was

---

[6] Although there was evidence in the summary judgment record that Deputy Barrientos's head and upper body may also have been in the vehicle at the time of the first shot, this Court did not rely on those allegations. Instead, this Court's opinion only refers to Deputy Barrientos's left arm being in the vehicle and his shoulder feeling pressure from the car when it went in reverse. *See* Mem. Op. and Order 6-7, ECF No. 68. The Court construed the facts in Plaintiff's favor, and thus relied on the fact that "Deputy Barrientos's body, other than his arm, was to the side of the police car." *Id.* at 19.

stretched out inside the car.  Moreover, Dr. Di Maio testified that he places Deputy Barrientos in the area of the side mirror.  *Id.*, Ex. F at 8, ECF No. 102-3.  Most adults have an arm span of greater than two feet.  A normally sized adult man could stand by the side mirror of a car and reach part of his left arm into the cabin of the car while still having his right hand at least two feet away from the driver of the vehicle.  The record does not reveal the distances of, for example, the side mirror to where Mr. Dominguez's chest would have been, the distance between the driver's side window and the driver's chest, or how long Deputy Barrientos's arms are.  When asked about the purported evidentiary discrepancies with Deputy Barrientos's statements, Dr. Di Maio was partially relying on Exhibit 4, which depicts Deputy Barrientos's entire upper half of his body (from the waist up) inside the car.  It is thus unclear whether Dr. Di Maio would agree that Deputy Barrientos could not have fired the first shot while only his extended left arm was in the vehicle and the rest of his body was upright outside the car.  In other words, the Court cannot conclude from reviewing his testimony whether Dr. Di Maio's opinion is that Deputy Barrientos's left arm must have been outside the vehicle or whether Dr. Di Maio was referring to Deputy Barrientos's body and head being outside the car.  If the former interpretation is correct, Dr. Di Maio does not explain why he would place all of Deputy Barrientos, including his entire left arm, outside the vehicle.[7]

---

[7] Notably, this Court in its Memorandum Opinion and Order did not rely on any facts as to how far away Deputy Barrientos's right hand and the muzzle of the gun were to Mr. Dominguez during the struggle and at the time he first fired his weapon.  Indeed, the summary judgment record on that factual issue did not reveal exactly where Deputy Barrientos's right-hand was.  For example, in the portion of Deputy Barrientos's deposition testimony attached to Defendant's motion for summary judgment wherein Deputy Barrientos is asked about how far the muzzle of the gun was from Mr. Dominguez's chest, Deputy Barrientos testified, "I couldn't say.  I don't know." Def.'s Mot. for Summ. J., Ex. B at 128:5-10, ECF No. 47-3.  He admitted, though, that it was "pretty close."  *Id.*  His deposition testimony on this point is basically consistent with his April 9, 2010 statement to investigators wherein the following exchange occurred:

Based on the record before it, the Court concludes that the facts underlying Dr. Di Maio's opinion that wound C was caused by the first shot are not clearly inconsistent with the facts upon which the Court previously relied, in particular that Deputy Barrientos's left arm was inside the vehicle at the time of the first shot.  Consequently, Plaintiff has not met the first factor necessary to be entitled to judicial estoppel.

Nor does the Court find that the second element of judicial estoppel is present here. Although the Court accepted Defendants' prior factual representation that Deputy Barrientos's left arm was in the vehicle and relied in part on it, there is no perception that Defendants have misled the Court.  Defendants did not get Dr. Di Maio's report or take his deposition until after this Court filed its Memorandum Opinion and Order at which time the importance of the sequence of the shots became more apparent.  The Court is unconvinced that Defendants are attempting to mislead the Court to obtain an unfair advantage.

---

| | |
|---|---|
| Boylston: | And would you say it was pressed up against him or kind of just, you know – |
| Barrientos: | Uh… |
| Boylston: | Not close (inaudible) – |
| Barrientos: | Not close. |
| Boylston: | -(Inaudible). |
| Barrientos: | I know, 'cause as he went for it, uhm, I don't know if his hand was on the gun or I pulled away and then engaged.  Uh . . . I know I was close to him. . . . I don't exactly know how close I was on him. |

Pl.'s Exhibit 4, ECF No. 56-4 at 21 of 42.  The summary judgment record did not reveal the exact position of Deputy Barrientos's right hand.  Nor did the Court describe or rely upon the position of the gun in ruling on Defendants' motion for summary judgment.

Finally, Defendants would not derive an unfair advantage or impose an unfair detriment on Plaintiff if not estopped.  Even if Plaintiff and the Court had the benefit of knowing Dr. Di Maio's testimony at the time of the briefing on Defendants' motion for qualified immunity and summary judgment, his opinion as to the distance from which wound C was inflicted would not have altered the Court's decision that qualified immunity for the initial shot was appropriate based on the totality of the circumstances.  The Court's June 13, 2012 Memorandum Opinion and Order relies upon extensive reasoning based on the totality of the circumstances.  Even if Deputy Barrientos were completely outside and next to the vehicle, based on the facts that Mr. Dominguez had attacked him and tried to disarm him of his gun, had taken control of the squad car with loaded firearms inside, had shown a complete disregard for the safety of a law enforcement officer and nearby citizens, and was likely to cause a highly dangerous chase with other police officers and the motoring public if not stopped, the Court's decision would not change on the issue of qualified immunity.

Plaintiff also argues that had she had the benefit of Dr. Di Maio's testimony earlier, it would have dramatically changed the depositions of Agent Rhoades and Deputy Barrientos.  For all the reasons given above to show that Dr. Di Maio's testimony is not clearly inconsistent with Deputy Barrientos's left arm being in the vehicle, this Court is unconvinced that the depositions would have dramatically changed in a way that imposes an unfair detriment on Plaintiff.  Moreover, Plaintiff will have the benefit of Dr. Di Maio's testimony to use on cross-examination at trial of these witnesses.  Plaintiff thus has not met the third factor in the judicial estoppel analysis.

In sum, given that the doctrine of judicial estoppel must be applied narrowly and cautiously, this Court will not apply the doctrine when the inconsistency and unfairness is not clear based on the record now before it.

### C.     Reliability

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Fed. R. Evid. 702.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determinate a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*  Rule 702 incorporates the principles of *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), to ensure that proffered expert testimony, even non-scientific and experience-based expert testimony, is both relevant and reliable.  *See* Fed. R. Evid. 702, 2000 Amendments.

*Daubert* challenges, like other preliminary questions of admissibility, are governed by Federal Rule of Evidence 104.  *United States v. Turner*, 285 F.3d 909, 912-13 (10th Cir. 2002). To determine whether an expert opinion is admissible, the district court performs the following two-step analysis:  (1) the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion, and (2) if the expert is so qualified, the court must determine whether the expert's opinion is reliable and helpful under the principles set forth in *Daubert*.  *See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).   Under *Daubert*, courts measure reliability of scientific evidence by considering the

following non-exhaustive factors:  (1) whether the expert's technique or theory can be and has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the general acceptance of the methodology in the relevant scientific community.  *See Kumho Tire*, 526 U.S. at 149-50; *103 Investors*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94).  The *Daubert* Court emphasized that the focus must be solely on the principles and methodology, not on the conclusions they generate.  *Daubert*, 509 U.S. at 595.  *Daubert*'s general holding setting forth the judge's gate-keeping obligation applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge.  *Kumho Tire*, 526 U.S. at 141.

Trial courts have broad discretion in determining the admissibility of expert testimony.  *See United States v. Velarde*, 214 F.3d 1204, 1208 (10th Cir. 2000) (court's admission of expert testimony is reviewed for abuse of discretion).  The court's discretion is equally broad in both deciding how to assess an expert's reliability, including what procedures to use in making that assessment, and in making the ultimate determination of reliability.  *Id.* at 1208-09.  A district court need not hold a *Daubert* hearing to perform its gatekeeping function, so long as the court has sufficient evidence to perform the task of ensuring that an expert's testimony is both relevant and reliable.  *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).  The district court, however, has no discretion as to the actual performance of its gate-keeping function.  *Turner*, 285 F.3d at 913.

Plaintiff does not dispute that Dr. Di Maio is qualified as an expert in gunshot pathology or that he is qualified to offer expert opinions on such things as the path and range of distance for wound C.   Because the Court has rejected Plaintiff's untimeliness and judicial estoppel

arguments, and Plaintiff does not dispute that Dr. Di Maio is qualified to render an opinion on range of distance for wound C, the Court will not exclude Dr. Di Maio's opinion that wound C was caused by a shot fired from "somewhere around 2-3 feet" and "definitely less than four feet." *See* Defs.' Resp., Ex. C, ECF No. 107-3 at 4-5 of 5.

Plaintiff, however, asserts that there is no reliable scientific methodology underlying his opinion that wound C was caused by the first shot, rather than one of the later shots, and that Dr. Di Maio is not qualified to offer an opinion on when Deputy Barrientos fired the shot that caused wound C. The Court recognizes that, if Defendants are able to establish that wound C was caused by the gunshot fired at the closest range, that fact alone does not conclusively establish that it was the first shot fired.

Plaintiff posits that Dr. Di Maio relied on Deputy Barrientos's testimony for his conclusion, not on a valid scientific methodology. Among other things, Dr. Di Maio's report lists "the account of the shooting" as one of the bases upon which Dr. Maio relied to support his opinion that wound C was the first shot fired. *See* Pl.'s Mot. to Exclude, Ex. E, ECF No. 102-2 at 6 of 7. The factual description of the incident set forth in Dr. Di Maio's report is largely derived from this Court's Memorandum Opinion and Order, which itself relied in part on Deputy Barrientos's testimony concerning the incident. If Dr. Di Maio is merely relying on Deputy Barrientos's testimony in formulating his opinion regarding the timing of each shot or on Agent Rhoades's diagrams to conclude that Deputy Barrientos was closest to Mr. Dominguez for the first shot, Dr. Di Maio's factual conclusion may be more properly made by the jury in its fact-finding role. Without a reliable scientific methodology linking the distance of the shots fired to the sequence of shots, Dr. Di Maio's opinion would not be sufficiently helpful to the jury to

admit it.  *See Goebel v. Denver and Rio Grande Western R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) ("It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.") (internal quotations omitted).

Dr. Di Maio, in rendering his opinion that wound C was caused by the first shot, also lists as support "the position of the shooter, the steep downward trajectory of the bullet, and the left to right path" as well as "the powder tattooing."  Pl.'s Mot. to Exclude, Ex. E, ECF No. 102-2 at 6-7 of 7.  Dr. Di Maio additionally testified that he reviewed the evidence of the location of the car and position of the shell casings.  *See* Defs.' Resp., Ex. A at 11-12, ECF No. 107-1.  Based on Dr. Di Maio's report and deposition testimony listing some forensic evidence among the facts upon which he relied, the Court finds there may be a scientific basis for reaching his conclusion as to the timing of the shot that caused wound C.  Consequently, a *Daubert* hearing will be necessary to resolve whether Dr. Di Maio's conclusion that wound C was caused by the first gunshot is based on a reliable, scientific methodology and whether Dr. Di Maio is qualified to render such an opinion.  The Court will therefore reserve ruling on the admissibility of Dr. Di Maio's opinion concerning the sequence of shots fired until after the hearing.

**IT IS THEREFORE ORDERED** that

1.      This Court will hold a *Daubert* hearing on the reliability of Dr. Maio's opinion testimony concerning the sequence of the shots fired on **Tuesday, January 7, 2014, at 10:00 a.m.** in the **Sixth Floor Courtroom** at the federal courthouse on **421 Gold Street**.

2.      The Court will **RESERVE RULING** on Plaintiff's Motion to Partially Exclude the Testimony of Vincent Di Maio (**ECF No. 102**) until after the conclusion of the hearing.

**SENIOR UNITED STATES DISTRICT JUDGE**