UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LUCIA FANCHER** individually and
as personal representative of the
**ESTATE OF NICK DOMINGUEZ**

    Plaintiff,

v.                                                         No. CIV 11-118 JAP/LAM

**JOHNNY BARRIENTOS,** in his individual capacity,
**SHERIFF TODD GARRISON** in his individual and
official capacity, and the **COUNTY OF DOÑA ANA**,

    Defendants.

## MEMORANDUM OPINION AND ORDER

On June 16, 2014, Defendants Johnny Barrientos, Sheriff Todd Garrison, and the County of Doña Ana (collectively, "Defendants") filed a MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT (Doc. No. 137) ("Motion"). On August 8, 2014, Plaintiff Lucia Fancher filed a RESPONSE IN OPPOSITION (Doc. No. 140) ("Response"). On September 5, 2014, Defendants filed a REPLY (Doc. No. 143) ("Reply"). For the following reasons, the Court will deny Defendants' Motion.

**I.  Background**

    A.  *Undisputed Facts*

On November 23, 2011, Defendant Johnny Barrientos, a police deputy employed by Defendant Doña Ana County, investigated a report that two twenty-bottle packs of Budweiser had been stolen from the Mesquite Mercantile in Mesquite, New Mexico.[1] A trail of clues and coincidences led Deputy Barrientos to Nick Dominguez and two companions at a nearby

---

[1] The factual background to Plaintiff's claims is set forward in greater detail in this Court's June 13, 2012 Memorandum Opinion and Order (Doc. No. 68) granting in part and denying in part Defendants' motion for summary judgment based on qualified immunity.

irrigation viaduct. Deputy Barrientos ordered Mr. Dominguez and his companions to lie on the ground so that he could pat them down for weapons (Deputy Barrientos felt threatened because someone—either Mr. Dominguez or one of his companions—had thrown a glass bottle at him).

Although Mr. Dominguez's companions complied with Deputy Barrientos's orders, Mr. Dominguez did not. Deputy Barrientos repeatedly ordered Mr. Dominguez to lie down, but after each order, Mr. Dominguez would crouch and ask Deputy Barrientos if he meant for him to get down "like this?" After Deputy Barrientos would again order Mr. Dominguez to lie down, Mr. Dominguez would advance a few paces, crouch, and ask the same question. At some point, Mr. Dominguez got close enough to Deputy Barrientos to lunge forward, grab Deputy Barrientos's gun, and tell his companions to flee. In the ensuing struggle, Deputy Barrientos's gun fired, jammed, and was dropped on the ground (no one was hit by the shot). As Barrientos picked up the gun and cleared the jam, Mr. Dominguez ran to Barrientos' unlocked and running police cruiser and got inside.

The prospect of Mr. Dominguez behind the wheel of a police cruiser that had an unsecured long gun in the passenger seat was a cause of concern for Deputy Barrientos. Deputy Barrientos leaned into the open driver's side window to try and snatch the keys from the ignition and prevent Mr. Dominguez from fleeing. Mr. Dominguez swatted away Deputy Barrientos's hand and put the cruiser in the reverse gear. Deputy Barrientos then shot at Mr. Dominguez seven times. Mr. Dominguez was hit at least five times and died shortly thereafter. After he fired the first shot, Deputy Barrientos saw Mr. Dominguez "slump." Response at 2 ¶ 4; Reply at 4. Deputy Barrientos then took two or three steps away from the car. Response at 2 ¶ 5. Deputy Barrientos testified that he felt safer after he had fired the first shot. *Id.*, Reply at 4. Nonetheless, the car continued to reverse, and Deputy Barrientos continued to fire. Response at 3 ¶ 6–7.

As far as the Court can gather from the evidence in the record, Deputy Barrientos's cruiser traveled in a reverse arc, away from where the struggle for the keys began. The New Mexico State Police (NMSP) Agent assigned to investigate the shooting made the following diagram of the scene, including the ambulance and patrol cars that arrived after the shooting.



*See* Doc. No. 141 at 40. Numbers 8 through 11 in the diagram roughly designate where the shooting began; numbers 30 and 31 where it ended. The NMSP Agent drafted this diagram using the location of shell casings, tire tracks from Deputy Barrientos's cruiser, and Deputy Barrientos's own account of the shooting.

B.  *Procedural History*

This Court previously ruled that Deputy Barrientos was entitled to qualified immunity for his decision to fire the first bullet at Mr. Dominguez, but that he was not entitled to qualified

immunity for the next six bullets he fired. *See* Memorandum Opinion and Order (Doc. No. 68) at 17–37. Plaintiff and Defendants both took interlocutory appeals of that decision. The Tenth Circuit Court of Appeals affirmed this Court's decision and remanded the case for further proceedings. *See Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013).

> C.  *After remand and further discovery, Defendants move for summary judgment, arguing that the first, justified shot was the proximate cause of Mr. Dominguez's death.*

Dr. Michelle Aurelius, who performed an autopsy on Mr. Dominguez, prepared a report identifying gunshot wounds in Dominguez's body. One of the wounds, "Wound C," showed that one bullet entered Mr. Dominguez's left chest, traveling down and to the right. That bullet pierced Dominguez's heart, liver, and other significant internal organs. Dr. Aurelius concluded that the bullet likely caused injuries sufficient to kill Mr. Dominguez. *See* Motion at 3 ¶¶ 12–13; Response at 1 ¶ 2. The parties agree that "Wound C" is the most serious of the approximately five gunshot wounds Mr. Dominguez suffered. Unsurprisingly, the parties disagree over whether "Wound C" was caused by Deputy Barrientos' first, justified shot, or one of the following six arguably unjustified shots.

The parties' disagreement stems almost entirely from the overlapping and at times conflicting accounts of three witnesses: Dr. Aurelius, Defendant's retained expert Dr. Vincent Di Maio,[2] and Plaintiff's retained expert Ronald Scott. Dr. Di Maio and Dr. Aurelius believe gunpowder stippling around "Wound C" indicates that the wound was caused by a gunshot made from a close to intermediate range (i.e., two to three feet). Motion at 4 ¶ 15. Dr. Aurelius testified in a deposition that she thought "Wound C" "could be" the shot that killed Dominguez. Motion

---

[2] This Court has previously concluded that Dr. Di Maio's testimony was admissible and would assist the trier of fact. *See* Memorandum Opinion and Order, Doc. No. 116.

at 3 ¶ 12. Dr. Aurelius's autopsy report states that Dominguez's death was caused by "multiple" gunshot wounds.

Dr. Di Maio reviewed Dr. Aurelius's autopsy report and other evidence in the record, including this Court's earlier Memorandum Opinion and Order granting in part and denying in part Defendants' motion for summary judgment based on qualified immunity. Doc. No. 137-3 at 1. Dr. Di Maio reached two conclusions that are relevant to Defendant's renewed motion for summary judgment. First, Dr. Di Maio concluded that "Wound C" was certainly sufficient by itself to kill Mr. Dominguez. In other words, Dr. Di Maio disagreed with Dr. Aurelius's conclusion in the autopsy report that Mr. Dominguez's death was caused by "multiple gunshot wounds." Second, having reviewed evidence outside the autopsy report (i.e., the fact that Deputy Barrientos' patrol car was reversing away from Deputy Barrientos as he fired at Mr. Dominguez), Dr. Di Maio concluded that Deputy Barrientos's first shot was in all likelihood the shot that caused "Wound C." *See* Reply at 4, 4 n.3.[3]

Defendants argue that they are entitled to summary judgment on Plaintiff's claims for two reasons. First, Defendants argue that this court erred in denying Deputy Barrientos qualified immunity for shots two through seven and must reconsider its earlier decision. *See* Motion at 8–9. Second, because this Court determined that Deputy Barrientos's first shot did not violate Mr. Dominguez's rights as a matter of law, Defendants argue that Plaintiff cannot recover for any damages caused by that shot. Defendants further argue that since Dr. Di Maio has concluded that the first shot in all likelihood killed Mr. Dominguez, they are entitled to summary judgment unless Plaintiff can point to sufficient evidence in the record to create a genuine dispute over that fact. *See* Motion at 6–7.

---

[3] Dr. Aurelius testified that there was no way to derive a sequence of shots from the wounds in Mr. Dominguez's body alone. *See* Doc. No. 137-1 at 30:21–22.

Plaintiff's response to Defendants' first argument is that this Court already considered and rejected the legal argument Defendants raise in support of what is essentially a motion to reconsider. *See* Response at 5. As to Defendants' second argument, Plaintiff responds that there are three genuine disputes as to material fact that require a jury to decide the question of whether Barrientos' first shot killed Dominguez. First, Plaintiff contends that Dr. Aurelius and Dr. Di Maio do not actually agree that Deputy Barrientos's first shot was from a close range. Response at 1 ¶ 3. Plaintiff's second source of factual dispute is Mr. Dominguez's autopsy report, which states that the cause of death was "multiple gunshot wounds." Response at 16. Third, Plaintiff's retained expert, Ronald Scott, has concluded that there is an equal likelihood that "Wound C" was caused by Deputy Barrientos's first five or final two shots. Response at 2 ¶ 5.

## II.     Legal Standard

### A.     *Standard for evaluating a motion for summary judgment under Fed. R. Civ. P. 56*

Under the Federal Rules of Civil Procedure, summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment,

then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

    B.    *Standard for evaluating a motion for summary judgment based on qualified immunity*

When a defendant raises the defense of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. See *Tolan v. Cotton*, ––– U.S. ––––, 134 S.Ct. 1861, 1865, 188 L.Ed.2d 895 (2014) (per curiam). "The first [prong] asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Id.* (alterations omitted). "The second prong…asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866. "[U]nder either prong" of the qualified immunity inquiry, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *See id.*

**III.**   **Discussion**

    A.    *Defendants' motion for reconsideration of the Court's order denying qualified immunity for all seven shots Deputy Barrientos fired at Mr. Dominguez.*

Defendants argue that this Court (and the Tenth Circuit Court of Appeals) erroneously denied Deputy Barrientos qualified immunity for shots two through seven in light of *Plumhoff v. Rickard*, 572 U.S. ___, 134 S. Ct. 2012 (2014), which was decided after the Court denied Deputy Barrientos' claim of qualified immunity and after the Tenth Circuit's mandate affirming the denial issued.

Defendants point to language in *Plumoff* stating that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop

7

shooting until the threat has ended." *Plumoff*, 134 S. Ct. at 2023. Defendants essentially make two arguments based on this language: (1) *Plumoff* announced a new rule for applying the qualified immunity analysis when police officers fire multiple shots; and (2) even if *Plumoff* did not announce a new rule, the Court's earlier holding merits reconsideration because *Plumoff* found that police officers were entitled to qualified immunity under circumstances that are factually indistinguishable from the circumstances that lead to Deputy Barrientos shooting Mr. Dominguez multiple times.

Defendants characterize *Plumoff* as holding that "it is not a violation of the Fourth Amendment for a police officer to continue firing his weapon until the threat has ended." Motion at 10. In other words, Defendants argue that the Court applied an incorrect rule in deciding Defendant's first motion for summary judgment based on qualified immunity when it analyzed Deputy Barrientos's first shot separately from the next six because a reasonable officer in Deputy Barrientos's situation would believe lethal force was justified even after the first shot.

The problem with this argument is that it characterizes this Court's division of shot one from shots two through seven as a statement of a legal standard, rather than an application of a legal standard to a very specific set of facts. The Court decided to analyze the shots separately not because controlling law pre-*Plumoff* mandated that analysis. Rather, the Court simply found that the facts, when viewed in Plaintiff's favor, showed that Deputy Barrientos's first shot was justified, but the subsequent shots were not. *Compare* Doc. No. 68 at 26 ("Deputy Barrientos…had reason to fear for the safety of the pursuing officers…. [T]he degree of risk to Deputy Barrientos was both imminent and substantial; and the risk to other officers and innocent bystanders, while perhaps not as imminent, was also substantial."), with *id.* at 30 ("A jury could construe Mr. Dominguez's slumping as an indication that he was no longer able to control the

vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public, Deputy Barrientos, or other responding officers.").

The *Plumoff* Court concluded that a police officer was entitled to qualified immunity when,

> during the 10–second span when all the shots were fired, [plaintiff] never abandoned his attempt to flee. Indeed, even after all the shots had been fired, he managed to drive away and to continue driving until he crashed. This would be a different case if [the officers] had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. But that is not what happened.

*Plumoff*, 134 S. Ct. at 2023.

The facts in this case make it just the kind of "different case" the *Plumoff* Court described: the evidence, viewed in the light most favorable to Plaintiff, shows that Deputy Barrientos "initiated a second round of shots after an initial round had clearly incapacitated [Mr. Dominguez] and had ended any threat of continued flight…." *Id.* The Court will therefore deny Defendants' motion to reconsider its earlier decision denying Deputy Barrientos qualified immunity for shots two through seven.

B.   *Whether Defendants are entitled to summary judgment on Plaintiff's claims based on evidence developed after the Court's denial of Defendants' motion for summary judgment based on qualified immunity*

Defendants argue that there is no genuine dispute as to two material facts: (1) that "Wound C" killed Mr. Dominguez, and (2) that "Wound C" was caused by Deputy Barrientos's first shot. Motion at 7. Defendants contend that if Wound C was caused by the first, justified shot, and the first shot killed Mr. Dominguez, then Plaintiff cannot show that any of her damages

9

were caused by a constitutional violation, and Defendants are entitled to judgment as a matter of law on Plaintiff's 42 U.S.C. § 1983 claim and state law tort claims.

      i.      <u>Whether there is no genuine dispute that "Wound C" killed Mr. Dominguez</u>

Defendants point to two sources for their conclusion that "Wound C" caused Mr. Dominguez's death. First, Defendants point to Dr. Aurelius's deposition testimony, where she stated that "Wound C" could be the shot that killed Mr. Dominguez. Doc. No. 137-1 at 14:4–18. Dr. Aurelius further testified that she would "prefer" Mr. Dominguez's four other gunshot wounds to "Wound C." *Id.* at 20:10–14, 22:3–9, 19–20. Dr. Aurelius testified that she "preferred" these wounds because "Wound C" went through Mr. Dominguez's heart and liver, maximizing the possibility of fatal blood loss. *Id.* at 20:10–14, 22:3–9, 19-20. Next, Defendants point to Dr. Di Maio's expert report and deposition testimony, in which Dr. Di Maio reaches similar conclusions about the fatal effects of Wound C . Doc. No. 137-3 at 5.[4]

The Court notes that in its Memorandum Opinion and Order (Doc. No. 68) denying in part Defendants' motion for summary judgment based on qualified immunity, the Court found that there was a genuine dispute as to whether a single shot or "multiple" shots caused Mr. Dominguez's death. *See* Doc. No. 68 at 10. While Plaintiff points this out on page sixteen of her Response, she concedes that she does not dispute Dr. Aurelius's and Dr. Di Maio's conclusions that "Wound C" was the most likely to have killed Mr. Dominguez. *See* Response at 2. For the purposes of this motion, then, the Court concludes that there is no genuine dispute that "Wound C" killed Mr. Dominguez.

---

[4] While Dr. Aurelius was unwilling to rule out any of the other gunshot wounds as potentially fatal wounds, Dr. Di Maio ruled out the other wounds as potentially life-threatening. *See*, *e.g.*, Doc. No. 137-3 at 4 ("Gunshot wound A was second in severity but this is academic in that death was due to wound C. With proper medical treatment, this wound would not have been fatal.").

      ii.      <u>Whether there is no genuine dispute that "Wound C" was caused by the first shot</u>

Defendants argue that this Court has already essentially found that the first shot caused "Wound C" on page seven of its Memorandum Opinion and Order denying Defendants' request for qualified immunity. On that page, the Court wrote that Deputy Barrientos "fired his duty weapon at Mr. Dominguez's center mass, or chest area" and observed Mr. Dominguez "slump" after that shot. Doc. No. 68 at 7.[5]

Next, Defendants point to Dr. Di Maio's deposition testimony. *See* Motion at 7. Dr. Di Maio testified that

> we know that gunshot wound number [sic] C is the closest shot because of the extensive tattooing…. [T]he police department's investigation shows that the car is going backwards at the time and that there is—the shell casings give an idea of the position. So the shell casings are described as going—there's an arch [sic] of these casings, and let's see, two, three—two, three, four, five, and six are…in a great arc. Then there's a gap, and when the car came to a stop, there were two more shell casings, which were called seven and eight. So he would—he would have been closest for the first shot.

Doc. No. 137-4 at 11:11–23.

Plaintiff responds that the statements of fact on page seven of the Court's Memorandum Opinion and Order merely restate witnesses' testimony, and that those witnesses' credibility remains to be decided by the jury. Response at 2. Next, Plaintiff contends that the report prepared by Mr. Ronald Scott, a forensic reconstruction expert, raises genuine issues of material fact as to which shot caused "Wound C." *See* Response at 2. Mr. Scott's expert report states that

> [t]here is evidence which provides angles of trajectory and a likely location where Deputy Barrientos was when he fired some of the

---

[5] Defendants also cite page nine of the Memorandum Opinion and Order, but that page merely summarizes a statement by New Mexico State Police Agent Norman Rhoades that while "Wound C" was "possibly" caused by Mr. Barrientos's first shot, his opinion was that the next three shots were equally likely to have caused "Wound C." Id. at 9 (citing Doc. No. 57-7 at 50:1–9).

> seven gunshots. Not all of the gunshots are capable of being determined for their distance from the victim and vehicle but there is an ability [sic] to eliminate certain gunshots as being related to the gunshot into the victim which is known as Gunshot "C".
>
> By eliminating those gunshots, it can be determined that there are at least two gunshots which could have resulted in Gunshot "C" to the left chest that traveled downward, left to right, and front to back.
>
> …
>
> There are two separate areas of discharged cartridge cases. The first area is near where the first series of five shots occurred and in the aggregate these indicate that the shots were fired prior to, during, or just after the patrol vehicle began a sweeping arc while traveling in reverse.
>
> …
>
> The second pattern of discharged cartridge cases is located near where the vehicle came to rest…. However, it is clear that there is sufficient distance between the first five discharged cartridge cases and the second pattern of two discharged cartridge cases that provides reliable [sic] and scientific basis to conclude that Deputy Barrientos fired two more times near the final resting location [of the vehicle].
>
> As a result of my training, education, and experience it is my opinion to a reasonable degree of scientific certainty that Gunshot "C" could have occurred (A) [d]uring the first series of five gunshots, or (B) [d]uring the second series of two gunshots at the vehicle's final resting location.

Doc. No. 140 at 12–13. Mr. Scott also infers from the location of the two casings from the final two bullets that Deputy Barrientos was at that point in a position to inflict a gunshot wound whose angle and other characteristics is consistent with the autopsy's description of "Wound C." *Id.* at 13.

The Court concludes that there is a genuine dispute over whether "Wound C" was caused by the first shot Deputy Barrientos fired at Mr. Dominguez. There are two independent bases for

this conclusion. First, Mr. Scott's expert report (and, presumably, his testimony at trial) establishes that Deputy Barrientos was in a position to cause "Wound C" at the beginning and the end of the shooting sequence. This establishes a genuine dispute over whether "Wound C" resulted from the first shot.

Even granting Defendant's motion to exclude Mr. Scott's testimony (Doc. No. 136) would not fully dispel doubts as to which shot caused "Wound C." Dr. Di Maio's conclusion that the first shot caused "Wound C" is based on "the account of the shooting; the powder tattooing and the trajectory of the bullet path." Doc. No. 137-3 at 4. But Dr. Di Maio's conclusion that "Wound C" was caused by the first shot cannot be derived from the autopsy report itself. As Dr. Aurelius explained in her deposition that while the angle and potential distance of each shot could be referred from the autopsy, a sequence could not. Doc. No. 137-1 at 30:21–22; *see also* Doc. No. 141 at 22.

Dr. Di Maio's opinion that "Wound C" was caused by the first shot is derived from evidence that remains subject to a credibility challenge. Take, for example, Dr. Di Maio's twin assumptions that (1) Deputy Barrientos did not move between the first and final shots (Doc. No. 141 at 21–22) and (2) that the cruiser reversed away from Deputy Barrientos's position for the duration of the shooting (Doc. Nos. 137-3 at 3; 141 at 22). These assumptions are not beyond dispute. For example, Dr. Di Maio discounted Deputy Barrientos's testimony that his gun was inside the cabin of the police cruiser when he fired the first shot. Doc. No. 140 at 27. And Dr. Di Maio must have disregarded opinions in the NMSP Agent's report that because shell casings were found where the cruiser came to a stop, Deputy Barrientos likely followed the cruiser before firing the last two shots. Doc. No. 141 at 41–42.

In sum, the Court concludes that Dr. Di Maio's testimony does not put the timing of "Wound C" beyond all genuine dispute. While neither party contests the truth of the conclusions in Dr. Aurelius's autopsy report, Dr. Di Maio went outside the report in order to reach his conclusion that Deputy Barrientos's first shot caused "Wound C." By doing so, Dr. Di Maio resolved ambiguities and contradicting facts in the record. And while Dr. Di Maio will be allowed to present his testimony about this at trial in order to assist a jury to resolve these issues, that does not mean that Defendants may bootstrap Dr. Di Maio's testimony in such a way as to avoid having a jury perform its crucial fact finding role.

      iii.      <u>Whether Defendants are entitled to judgment as a matter of law</u>

Defendants have marshaled strong evidence that Deputy Barrientos's first shot caused "Wound C." But the autopsy report concludes that Mr. Dominguez died from multiple gunshot wounds. Dr. Aurelius testified that a sequence of shots could be derived from Mr. Dominguez's autopsy alone. Mr. Scott, Plaintiff's proposed expert witness, opines that it is just as likely that "Wound C" was caused by the final two shots as it was by the first five. In other words, this is a case where "two forces are actively operating, one because of [Deputy Barrientos's] negligence, the other not because of any misconduct on his part…." Restatement (Second) of Torts § 432(2). "[E]ach of itself is [possibly] sufficient to bring about harm…." *Id.* Whether Deputy Barrientos's justified first shot or the next, possibly unjustified six shots caused Mr. Dominguez's death is a question that must be decided by a jury. *See id.* Therefore, Defendants are not entitled to summary judgment on Plaintiff's claims.

## CONCLUSION

IT IS ORDERED THAT Defendants' Motion for Summary Judgment (Doc. No. 137) is DENIED.

*/s/ James A. Parker*

_____
SENIOR UNITED STATES DISTRICT JUDGE