UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LUCIA FANCHER** individually and
as personal representative of the
**ESTATE OF NICK DOMINGUEZ**

 Plaintiff,

v.   No. CIV 11-118 JAP/LAM

**JOHNNY BARRIENTOS,** in his individual capacity,
**SHERIFF TODD GARRISON** in his individual and
official capacity, and the **COUNTY OF DOÑA ANA**,

 Defendants.

## MEMORANDUM OPINION AND ORDER

On June 16, 2014, Defendants filed DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT RONALD R. SCOTT AND MEMORANDUM IN SUPPORT (Doc. No. 136) (Motion). On August 5, 2014, Plaintiff filed a RESPONSE IN OPPOSITION [TO] DEFENDANTS' MOTION TO EXCLUDE EXPERT RONALD B. SCOTT (Doc. No. 141) (Response). On September 5, 2014, Defendants filed DEFENDANTS REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION [TO] DEFENDANTS' MOTION TO EXCLUDE EXPERT RONALD R. SCOTT (Doc. No. 145) (Reply). For the following reasons, the Court will grant in part and deny in part the Motion.

**I. Background**

When employees of the Mesquite Mercantile in Mesquite, New Mexico called the police to report a beer theft, no one could have predicted that a short while later, Nick Dominguez would lay dying in the driver's seat of Sheriff's Deputy Johnny Barrientos's police cruiser. Intervening events make the result somewhat easier to understand: A trail of clues lead Deputy

Barrientos to Mr. Dominguez and his friends.[1] When confronted, Mr. Dominguez attacked Deputy Barrientos and then attempted to steal Deputy Barrientos's police cruiser. Deputy Barrientos shot seven bullets at Mr. Dominguez. This Court has previously held that Deputy Barrientos was justified in firing the first shot. But the Court denied the Defendants' motion for summary judgment based on qualified immunity because the question of whether the remaining six shots were also justified turned on disputed questions of fact. *See* Doc. No. 68.

Defendants enlisted Dr. Vincent Di Maio, a forensic pathologist, to assess the autopsy report on Mr. Dominguez along with other evidence. Dr. Di Maio opines that "in all medical probability," Deputy Barrientos's first shot caused the wound that killed Mr. Dominguez.[2] *See* Memorandum Opinion and Order Denying Plaintiff's Motion to Exclude Dr. Di Maio, (Doc. No. 116) at 5; Memorandum Opinion and Order Denying Defendants' Motion for Summary Judgment (Doc. No. 149) at 5.

Plaintiff has enlisted Ronald R. Scott, a ballistics and forensic reconstruction expert, to rebut Dr. Di Maio's opinions. Mr. Scott opines that there is an equal chance the fatal gunshot wound was caused by any of Deputy Barrientos's first five or final two shots. Defendants argue that Mr. Scott's opinions should be excluded for three reasons: (1) Mr. Scott is not qualified to dispute Dr. Di Maio's opinions (Motion at 5–6); (2) Mr. Scott's methodology is unreliable (Motion at 6–7); and (3) Mr. Scott's conclusions are so speculative that his testimony will not assist the jury (Motion at 7–9).

---

[1] A more detailed recitation of the events leading to Mr. Dominguez's death is set out in this Court's June 13, 2012 MEMORANDUM OPINION AND ORDER (Doc. No. 68), the Tenth Circuit Court of Appeals' mandate affirming the Court's decision (Doc. No. 86), and this Court's recent MEMORANDUM OPINION AND ORDER (Doc. No. 152) denying Defendants' renewed motion for summary judgment.

[2] The parties more or less agree that one wound was most likely the wound that caused Mr. Dominguez's death. Dr. Aurelius's autopsy report, however, states that Mr. Dominguez's death was caused by "multiple" gunshot wounds, and the Court has previously noted a factual dispute on this point. But since the issue is irrelevant with respect to Defendants' motion to prohibit Mr. Scott from testifying, the Court will assume for simplicity's sake only one shot caused Mr. Dominguez's death.

## II. Legal standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed R. Evid. 702. Rule 702 codifies the principles governing the admissibility of expert testimony set out in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) and *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702 advisory committee cmt. (2000 amendments).

In considering whether a putative expert's opinion is admissible, the district court performs a two-step analysis. First, the court determines whether the expert is qualified by knowledge, skill, experience, training or education to render the opinion that the would-be expert offers. Second, if the expert is so qualified, the court must decide whether the expert's opinion is reliable and would assist the fact finder. *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

The reliability of an expert's methodology is evaluated with the following non-exhaustive set of factors: (1) whether the expert's technique or theory can be and has been tested; (2) whether the theory has been subject to peer review and publication; (3) whether the method has a high known or potential rate of error of the technique or theory when applied and if there are standards and controls controlling the method's operation; and (4) whether the method is

3

generally accepted in a relevant scientific community. *Kumho Tire*, 526 U.S. at 149–50; *103 Investors*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593–94). The *Daubert* Court emphasized that the district court's focus must be solely on the expert's principles and methodology, not the expert's conclusions. *Daubert*, 509 U.S. at 595.

Trial courts have broad discretion in determining the admissibility of expert testimony. *United States v. Valarde*, 214 F.3d 1204, 1208 (10th Cir. 2000). Trial courts have equally broad discretion in determining how to assess an expert's reliability, including which procedures to use in making that assessment. *Id.* at 1208–09. The district court, however, has no discretion as to whether it may or may not perform the gate-keeping function. *United States v. Turner*, 285 F.3d 919, 913 (10th Cir. 2002).

**III.   Discussion**

    A.   <u>Mr. Scott's qualifications</u>

Mr. Scott was employed as a police Deputy by the Massachusetts State Police (MSP) for more than 25 years before retiring. *See* Doc. No. 136-1. Mr. Scott served in the MSP's "Ballistics Section" and was the commanding Deputy of the MSP's ballistics laboratories. *Id.* at 1. In this role, Mr. Scott "conducted, supervised, and trained personnel in forensic investigations, shooting reconstruction, and the dynamics involved in shooting incidences [sic]." *Id.* Mr. Scott was a member of the MSP Firearms Review Board, "which evaluated departmental Deputy involved shooting incidents." *Id.* at 2. Mr. Scott has "investigated over one hundred twenty five police involved fatal shooting occurrences and approximately one hundred seventy non-fatal police involved shooting events and multiple cases where there were no injuries." *Id.*

B.     Mr. Scott's assumptions of fact

In his Report (Doc. No. 136-1), Mr. Scott states that he analyzed the following information: the autopsy and autopsy report of Nick Dominguez prepared by Dr. Michelle Aurelius (Doc. No. 140 at 15); Dr. Di Maio's expert report (Doc. No. 137–3); an Internal Affairs PowerPoint presentation explaining the shooting (Doc. No. 57–8); and a transcript of this Court's *Daubert* hearing on Dr. Di Maio (Doc. No. 123).

Based on his reading of the above materials, Mr. Scott makes the following factual assumptions about the events leading to Mr. Dominguez's death:

1. After Mr. Dominguez pushes Deputy Barrientos' hands away from the ignition, Deputy Barrientos begins firing at Dominguez. Report at 2–3.
2. The vehicle moves in a reverse arc while Deputy Barrientos keeps firing. Deputy Barrientos stops firing when the vehicle stops moving. *Id.* at 3.
3. Deputy Barrientos and the vehicle were "in motion" until the patrol vehicle came to a rest. *Id.*
4. The gunshots caused stippling on Mr. Dominguez's chest and the ventral areas of his right and left arms *Id.*
5. A 186 grain jacketed spent projectile was recovered from the fatal wound in the "right lower back area." *Id.* at 4.
6. The location of shell casings at the scene of the shooting were likely disturbed by vehicles and police walking around the scene while it was dark and difficult to see. *Id.* at 4.

C.     Mr. Scott's opinions

   i.     Mr. Scott's Report (Doc. No. 136-1)

Mr. Scott's Report sets forward, in pertinent part, the following opinions:

> Intermediate deflections or "change in projectile condition" can cause bullet trajectories to change.
>
> …
>
> When stippling occurs during a sustained sequence of shots, and other evidence suggests the shooter could have been in a position to cause the stippling more than once during the sequence, then it

5

> is "not scientifically possible to conclude the exact shot of the series that is associated" with the stippling.

*Id.* at 3–4.

> My review of the source materials indicate [sic] that there are some significant issues involving the omission of, or non-compliance with, generally accepted methodology which has produced inaccurate results.
>
> In addition, conclusions about a "possible stippling pattern" are not based on the scientific method until such evidence is examined and tested using generally accepted methodology which can then be professed [sic] based on reliable and valid testing.
>
> The distance testing procedures [in Dr. Di Maio's report and the NMSP PowerPoint presentation] do not appear to be in compliance with the procedures outlined in the Procedures Manual of the Association of Firearms and Toolmark Examiners (AFTE) and other treatises which provide guidance on the material substrates and methods to be employed to reach a valid and reliable conclusion.
>
> Even though the testing is flawed, there is a significant conflict between the conclusions reported and testified to by Dr. Di Maio and the testing results shown in the [NMSP] PowerPoint.
>
> …
>
> There is evidence which provide [sic] angles of trajectory and a likely location where Deputy Barrientos was when he fired some of the seven /7/ gunshots. Not all the gunshots are capable of being determined [sic] for their distance from the victim and vehicle but there is an ability [sic] to eliminate certain gunshots as being related to the [fatal] gunshot….
>
> By eliminating those gunshots, it can be determined that there are at least two /2/ gunshots which could have resulted in [the fatal] gunshot….
>
> Several gunshots struck the exterior of the patrol vehicle on the front door and through the driver side door open window and [sic] gunshots struck the victim in the arms as well as the right chest. These amount to an aggregate of six /6/ gunshots.
>
> Gunshot #7 (not sequential) which produced [the fatal wound] occurs when Deputy Barrientos would have been located outside

the driver door, forward of the driver seat, with victim Nick Dominguez located in the driver seat but specific posture and body orientation unknown [sic]. At the time of the gunshot, Deputy Barrientos' pistol is angled downward, the projectile is capable of clearing the door without striking it nor striking the stearing wheel and [sic] since there is an absence of stippling on the left shoulder of Mr. Dominguez it is most likely that his shoulder was not drooped forward as an intervening object between the forward expansion of gunshot residue.

There are two separate areas of discharged cartridge cases. The first area is near where the first series of five shots occurred and in the aggregate these indicate that the shots were fired prior to, or during, or just after the patrol vehicle began a sweeping arc while traveling in reverse.

These five /5/ discharged cartridge cases are somewhat scattered indicating that Deputy Barrientos was likely moving as the motor vehicle moved, but it cannot be ruled out that the influx of medical personnel and their vehicles, and police personnel and their vehicles may have contributed to dislocation of these items.

The second pattern of discharged cases is located near where the vehicle came to rest, the distance of which [sic] I do not have information on. However, it is clear that there is sufficient distance between the first five /5/ discharged cartridge cases and the second pattern of two /2/ discharged cartridge cases that provides reliable and scientific basis to conclude that Deputy Barrientos fired two more times near the final resting location [sic].

Doc. No. 136-1 at 5–6.

Based on these opinions, Mr. Scott offers the following conclusions:

[T]o a reasonable degree of scientific certainty…[the fatal wound] could have occurred:

A.    During the first series of five /5/ gunshots, <u>or</u>
B.    During the second series of two /2/ gunshots at the vehicle's final resting location.

In either of these locations Deputy Barrientos would be located outside the driver door, forward of the driver seat, with victim Nick Dominguez located in the driver seat but specific posture and body orientation unknown. At the time of the gunshot, Deputy Barrientos' pistol is angled downward, the projectile is capable of clearing the door without striking it nor striking the steering wheel

7

> and since there is an absence of stippling on the left shoulder of Mr. Dominguez it is most likely that his shoulder was not drooped forward as an intervening object between the forward expansion of gunshot residue.
>
> Neither of the possibilities in A or B can be excluded based on the objective evidence since [the fatal wound] is capable of being inflicted under either situation.

*Id.* at 6.

### ii.   Mr. Scott's deposition testimony

At a deposition, Mr. Scott was asked "what was the generally accepted methodology that you used to reach [your] opinions" that "the [fatal] shot could have come from two locations." Doc. No. 136-2 at 2. Mr. Scott responded:

> We look to the location of the discharged cases. Look at the autopsy report. Look at the presence or absence of stippling powder tattooing. Look at the –again, going back to the autopsy report, the trajectory or the wound path that the pathologist has determined. And we look at the damage from gunshots to the police cruiser which also give an indication of direction.
> …
> Also what we look at is…the absence of certain evidence. And going back again to the autopsy report, the description of the wounds and the presence of stippling, etc., over this whole series of gunshots that occurred.

Later, the following line of questioning occurred:

> Q:   …[W]hich location is more likely the location for [the fatal wound?
> A:   Either.
> Q:   Equally. Equal probability?
> A:   Yes.
> Q:   So 50/50 it could have come from the beginning or the end?
> A:   Correct.

Finally, Mr. Scott was asked about the gunpowder stippling on Mr. Dominguez's torso and underarms:

> Q: [W]as it appropriate for you to review photos to reach opinions as to stippling related to [the fatal wound] or not related to [the fatal wound]?
> A: Well, there's a line between the medical opinion of that and the firearms opinion of that.
> Q: Okay. And what's the line?
> A: The line is that the pathologist would make the determination as to what stippling is attributed to what wound.
> Q: Okay. And would the firearms expert be able to do that?
> A: I think you could do it to some extent, but not in this case, no.
> …
> Q: So independently you have not, by reviewing photographs, attributed any stippling to [the fatal wound]?
> A: Well, all I can say is there's stippling there. Whether it's attributed only to gunshot C, I can't say that.

D. <u>Defendants' arguments for excluding Mr. Scott's opinions</u>

   i. <u>Defendants' challenge to Mr. Scott's qualifications</u>

Defendants contend that because Mr. Scott is not a pathologist, he "cannot provide opinions to rebut those provided by Dr. Di Maio. [Mr.] Scott lacks the expertise and qualifications necessary" to rebut Dr. Di Maio's opinions. Motion at 6. Plaintiff responds that the Court cannot exclude Mr. Scott's testimony simply because Mr. Scott's expertise overlaps with Dr. Di Maio's. Response at 8.

The Court would be inclined to agree with Defendants if they were able to identify a specific aspect of Mr. Scott's underlying assumptions or opinions that conflicts with Dr. Di Maio's expertise. But Mr. Scott concedes that he is not qualified to dispute (and does not dispute) any of Dr. Di Maio's opinions that are based on Mr. Dominguez's autopsy. Instead, the chief conflict between the experts stems from the relative importance each attaches to the location of shell casings found at the scene of the shooting. Dr. Di Maio discounts the location of the shell casings; Mr. Scott contends that some meaningful inferences (i.e., that Officer

9

Barrientos moved during the shooting so that he could have been very close to Mr. Dominguez when he fired his last two shots) can be drawn from the locations of the shell casings.

An analogy is helpful. An accident reconstruction expert could look at skid marks at the scene of an accident and conclude that a semi tractor trailer was traveling 95 miles per hour at the time of a collision. A technician with technical knowledge about the make and model of the tractor trailer could testify that the truck's on-board speed limiter would make it impossible for the trailer to travel at that speed. Each witness's testimony is helpful, even though their conclusions are mutually exclusive. It is for the jury to decide which to credit and which to reject.

So too here. Without identifying how Mr. Scott intrudes on Dr. Di Maio's exclusive expertise as a forensic pathologist, Defendants' objection to Mr. Scott's qualifications boils down to a firm but unsupported belief that only pathologists can disagree with other pathologists. To be sure, Mr. Scott seems well aware that he is being offered as a rebuttal expert. Hence, he seems unwilling to be pinned down as to whether he genuinely disputes Dr. Di Maio's qualifications and methods. Thus his report states that

> conclusions about a 'possible stippling pattern' are not based on the scientific method…[and] the distance testing procedures [in Dr. Di Maio's report] do not appear to be in compliance with…the Procedures Manual of the Association of Firearms and Toolmark Examiners (AFTE) and other treatises which provide guidance on the material substrates and methods to be employed to reach a valid and reliable conclusion.

Doc. No. 136-1 at 5. But in his deposition, Mr. Scott appeared to disclaim any pretense that he was qualified to challenge Dr. Aurelius's conclusion in the autopsy report that the fatal shot was likely fired from a very close range due to the presence of gunpowder stippling around that wound.

To the extent that Plaintiff seeks to elicit testimony from Mr. Scott that challenges the methodological basis for Dr. Aurelius and Dr. Di Maio's conclusion that the fatal shot was fired from a close or intermediate distance, the Court will grant the Motion and strike the statement on page five of Mr. Scott's expert report quoted above. But to the extent that Defendants seek to exclude Mr. Scott from testifying at trial simply because his analysis of the shell casing locations gives rise to a conclusion that conflicts with Dr. Di Maio's, the Court will deny the motion.

        ii.        Defendants' challenge to Mr. Scott's methodology and opinions

Defendants argue that Mr. Scott's conclusions are based on an unreliable methodology. Defendants make three arguments in this respect: (1) even in a controlled environment, the location of a shell casing cannot reliably determine the location of the shooter; (2) even assuming that Mr. Scott's methodology is reliable, the acknowledged corruption of the shooting scene means it cannot be applied at all usefully to this case; and (3) Mr. Scott's testimony is in any case unsupported speculation and therefore excludable on that ground as well. The Court will address each contention in turn.

        1.        <u>Reliability of the methods underlying Mr. Scott's conclusions</u>

Defendants argue that the position of a shooter cannot be extrapolated using the location of used cartridges, even in controlled environments. Defendants reach this conclusion by challenging an implicit assumption underlying Mr. Scott's reconstruction method: spent cartridges fall behind the shooter and to the right. Motion at 6 (citing William J. Lewinski et al., *Fired Cartridge Case Ejection Patterns from Semi-Automatic Firearms*, 2 INVESTIGATIVE SCIENCES J. 3 (Nov. 2010)).

In the study that Defendants cite in their Motion, test subjects fired 7,670 bullets in a controlled environment. The shots were fired using different grips, different firing motions,

11

different weapons, and different ammunition. Lewinski et al., *supra*, at 15. The study authors found that in total, 73.6% of the cartridge casings "fell in the 90-degree section to the right and rear of the shooter." *Id.* at 16.

Focusing on specific grips, motions, or weapon types produced more volatile results, however. For example, holding a firearm with a one-handed grip pointed 22 degrees downward and cantilevered 45 degrees inward reduced the percentage of casings falling to the right and rear of the shooter from 73.6% to 29.2%. *Id.* at 20. Defendants argue that this study impugns the reliability of forensic reconstruction as a method for determining where Deputy Barrientos stood when he fired the fatal shot. Further, they argue that Mr. Scott's failure to "test[]…the cartridge case locations before making his determination about" the fatal wound undermines his reliability.

To reiterate, the Supreme Court has set out the following factors as helpful determinants of expert reliability: (1) whether the expert's technique or theory can be and has been tested; (2) whether the theory has been subject to peer review and publication; (3) whether the method has a high known or potential rate of error of the technique or theory when applied and if there are standards and controls controlling the method's operation; and (4) whether the method is generally accepted in a relevant scientific community. *Kumho Tire*, 526 U.S. at 149–150. The study Defendants cite indicates that under all of the *Kumho* factors, Mr. Scott's conclusions are based on a reliable method.

First, the Study itself tested forensic reconstruction of shooter locations based on cartridge locations, so it is not as if the theory cannot be or has not been tested. And according to the study, a spent casing's location can be used to infer the shooter's position (on average) at least 70% of the time. The study likewise provides answers to the rest of the *Kumho* factors. The study itself subjects the theory to peer review and publication because it evaluates the underlying

12

assumptions of forensic reconstruction and publishes the results. The study furnishes a known rate of error—roughly thirty percent. The study also imposes standards and controls: it eliminates sources of inaccuracy such as terrain, wind, and grip style. Lewinski et al., *supra*, at 4. Finally, the study acknowledges that extrapolating shooter location from spent cartridge locations is widely accepted among forensic reconstruction experts. It merely points out that this widespread acceptance may be problematic given the known or potential rates of error.

      Defendants contend that Mr. Scott's failure to personally visit the scene of the shooting or to review Deputy Barrientos's testimony further undermines the reliability of his opinions. Motion at 6. Instead, Mr. Scott derives his factual assumptions from the written observations of police officers who examined the scene and identified the location of shell casings. But this objection is irrelevant with respect to determining the reliability of Mr. Scott's methodology. To analogize to Defendants' own expert, objecting to Dr. Di Maio's failure to personally examine Mr. Dominguez's corpse does not undermine the reliability of forensic pathology as a science. So too for Mr. Scott. While Mr. Scott's failure to review Deputy Barrientos's account arguably reduces the helpfulness of his opinion to the jury, this does not unmoor Mr. Scott's opinions from the undisputed facts of this case.

      2.    <u>Whether, assuming that Mr. Scott's methodology is reliable, the acknowledged corruption of the shooting scene means his methodology cannot be applied usefully to this case.</u>

      Mr. Scott's conclusion is that it is equally likely the fatal wound was caused by a bullet Deputy Barrientos fired during the first sequence of five shots or a bullet he fired in the second sequence of two shots. This conclusion is based on the angle of the wound and the distance Deputy Barrientos stood from the car. Defendants argue that Mr. Scott undermines his own

opinions by acknowledging that contamination of the shooting scene makes it difficult to conclude that the location of each cartridge can be used to extrapolate Deputy Barrientos's location at the time it was discharged.

It is true, as a general matter, that variability in the distance a cartridge travels from the firearm can make it difficult to determine with certainty where a shooter stood based only on the location of the spent cartridge. And failing to control for environmental influences like footsteps and wind can only increase the rate of error. Mr. Scott will likely concede that the presence of vehicles and foot traffic in the area where Deputy Barrientos fired the first five shots undermines the method's helpfulness with respect to those shots. But the path of the car is undisputed. So is the location of the final two shells and Mr. Scott's opinion that they were not disturbed.[3] In light of these facts, the Court concludes that Defendants' objections to Mr. Scott's methodology and reliability relate to the weight Mr. Scott's testimony should be given, not its admissibility.

      3.      <u>Whether Mr. Scott's testimony should be excluded as unsupported speculation</u>

Mr. Scott has opined that it is equally likely that the fatal wound was caused during the first five or the final two shots Deputy Barrientos fired at Mr. Dominguez. Defendants contend that since the crucial question to be decided by the jury in this case is whether the fatal wound was caused by the first, justified shot, Mr. Scott's opinion is mere speculation. But the certainty—or lack thereof—of an expert's opinion can have no bearing on whether or not the opinion is speculative. Speculation is "theorizing about matters of which there is no certain knowledge." *Black's Law Dictionary* 1435 (8th ed. 2004). Mr. Scott's failure to offer a concrete opinion about the cause of the fatal wound does not itself render his opinion speculative.

---

[3] NMSP Deputy Rhoades, who compiled an analysis of the shooting that Defendants' and Plaintiff's experts both appear to rely on, concluded that the spent cartridges of the final two shots were not moved "due to thick weeds" and "no indication of vehicle or foot traffic in that area." *See* Doc. No. 57-8 at 9.

If anything, it is the other way around. Since Mr. Scott's opinion is based on the location of shell casings and their distance from Deputy Barrientos's car, his ability to offer a concrete opinion about the distance of a given shot from the car can only be based on the distance of the corresponding shell casing from the car. Thus, Mr. Scott would be speculating if he were to opine that a specific shot had caused the fatal wound when another shell casing at the scene was found at the same distance from the car.

To be sure, an expert's opinion must be helpful to the finder of fact, and Mr. Scott's opinion that there is a '50-50' chance the fatal wound was caused by the first five or the last two shots cannot itself resolve the disputed question of fact at the heart of this case. But the Court must "focus…solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. If an expert's opinion does not make the jury's task easy, it does not necessarily follow that the expert's opinion is unhelpful.

## CONCLUSION

Mr. Scott may offer his opinion that there is an equal likelihood the final two, as opposed to the first five, shots caused Dominguez's death because he is qualified by experience and his methodology is reliable. However, Mr. Scott may not call into question Dr. Di Maio's own methodologies and the statements of fact about the presence of gunpowder stippling around the fatal wound described in Dr. Aurelius's autopsy report.

IT IS ORDERED THAT Defendants' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT RONALD R. SCOTT AND MEMORANDUM IN SUPPORT (Doc. No. 136) is GRANTED IN PART and otherwise DENIED as set forth above.

_____
SENIOR UNITED STATES DISTRICT JUDGE