UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LUCIA FANCHER,
individually and as personal representative of
THE ESTATE OF NICK DOMINGUEZ,

    Plaintiff,

vs.

JOHNNY BARRIENTOS,
in his individual capacity,
TODD GARRISON,
Sheriff in his individual and official capacity,
DONA ANA COUNTY NEW MEXICO,

    Defendants.

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION IN LIMINE (Doc. No. 158)**

In DEFENDANTS' MOTION IN LIMINE TO EXCLUDE TESTIMONY OF WILLIAM PATTERSON CONCERNING HEDONIC DAMAGES (Doc. No. 158) (Motion), Defendants Johnny Barrientos (Deputy Barrientos), Sheriff Todd Garrison (Sheriff Garrison), and the County of Dona Ana, New Mexico (County) (together Defendants) ask the Court to exclude the testimony of Plaintiff's economics expert, William Patterson, pertaining to hedonic damages, or loss of enjoyment of life damages. Plaintiff opposes the Motion; however, Plaintiff has not filed a response to the Motion.[1] Because Mr. Patterson's testimony about the amount of hedonic damages attributable to Plaintiff's loss of enjoyment of life is unreliable and would be unhelpful to a jury, the Court will grant the Motion in part. However, the Court will deny the Motion in part and will allow Mr. Patterson to give generalized testimony about the concept of hedonic damages.

---

[1] Under DNM-LR 7.1(b), "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." Although, the Court may grant the Motion under this rule, the Court will address the merits.

1

I.     BACKGROUND

This case involves the shooting death of Nick Dominguez, following an encounter with Deputy Barrientos. On March 29, 2010 at around 5:41 pm, Deputy Barrientos was called to the Mesquite Mercantile (Mercantile) in Mesquite, New Mexico to investigate a report that two twenty-bottle packs of Budweiser beer had been stolen. Based on the surveillance video and information from witnesses, Deputy Barrientos was led to a nearby irrigation canal where he found two young men and one young woman hiding behind a large irrigation pump. Deputy Barrientos approached the group with his gun drawn.

At 6:21 pm, Deputy Barrientos radioed and told dispatch that he had three suspects at gun point. Two of the suspects, Valerie Gonzales and Michael Herrera, cooperated with Deputy Barrientos' instructions to lie on the ground. Mr. Dominguez, however, approached Deputy Barrientos, dropped to one knee, lunged at Deputy Barrientos, and grabbed his duty pistol. As Deputy Barrientos struggled with Mr. Dominguez for control of the gun, the gun discharged into the ground and then jammed. Deputy Barrientos drew his Taser and attempted to deploy it on Mr. Dominguez, but the Taser malfunctioned. Mr. Dominguez released his grip on the gun, pushed free from the struggle, and ran directly to Deputy Barrientos' patrol vehicle. Deputy Barrientos quickly cleared his jammed pistol and ran after Mr. Dominguez.

Mr. Dominguez entered the unlocked patrol vehicle on the driver's side just as Deputy Barrientos caught up with him. Deputy Barrientos had left an assault rifle, loaded and unsecured, on the passenger seat of his patrol vehicle. With his duty weapon in his right hand, Deputy Barrientos reached into the patrol vehicle and attempted to remove the ignition keys with his left hand. Mr. Dominguez pushed Deputy Barrientos' left hand away, raced the engine, and shifted the vehicle into reverse.

Before the vehicle started going backwards, Deputy Barrientos fired his duty weapon at Mr. Dominguez's center torso striking him in the chest area. Mr. Dominguez slumped over as the patrol vehicle began to go backwards. After the first shot, Deputy Barrientos stepped back from the vehicle two or three steps to position himself at a safer distance. While the patrol vehicle backed away, Deputy Barrientos fired six more shots into the vehicle. At 6:22 pm, Deputy Barrientos notified dispatch that a suspect was down. The Office of the Medical Examiner determined that Mr. Dominguez's death was caused by "multiple gunshot wounds."

In her COMPLAINT FOR CIVIL RIGHTS VIOLATIONS, TORT CLAIMS, AND DAMAGES (Doc. No. 1-1) (Complaint), Plaintiff, as personal representative of Mr. Dominguez's estate, alleges in Count I that Deputy Barrientos is liable under 42 U.S.C. §1983 for the misuse of deadly force in violation of Mr. Dominguez's constitutional rights. Count II is a claim against Sheriff Garrison and Dona Ana County under § 1983 for failing to adequately train and supervise Deputy Barrientos causing him to misuse deadly force. Count III is a state law tort claim against Deputy Barrientos for assault and battery. Count V[2] is a claim against Dona Ana County under the doctrine of respondeat superior for the state law torts committed by Deputy Barrientos. Count VI is a claim for loss of consortium brought by Plaintiff on her own behalf as Mr. Dominguez's mother. Plaintiff asks for compensatory and punitive damages as well as equitable relief. Compensatory damages include the value of lost earnings and hedonic damages, which would compensate Plaintiff for the value attributable to Mr. Dominquez's loss of enjoyment of life. Plaintiff proffers the testimony and opinion of Mr. Patterson, an economics expert, to prove the value of both of these types of compensatory damages.

---

[2] There is no Count IV in the Complaint.

II. DEFENDANTS' MOTION

Defendants argue that Mr. Patterson's testimony concerning hedonic damages, and specifically the hypothetical benchmark of $100,000 per year[3] that Mr. Patterson used to calculate the total value of Mr. Dominguez's hedonic damages should be excluded as unreliable under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Plaintiff asks for hedonic damages as one component of compensatory damages.[4] Hedonic damages are based on the notion that a person's life has value above mere economic productivity, which is measured by one's earning capacity. "Pleasure of life damages," another name for hedonic damages, quantify the value of a person's time away from work and the intangible pleasure a person sometimes derives from work. (Mot. Ex. A Patterson Report at p. 10.) Mr. Patterson states, "[i]n terms of annual values of the pleasure of life component of a whole life, [economic] studies indicate an average annual value, for a typical (38 year old male) person of about $55,000 per year in 1988 dollars (or approximately $101,379/ year in 2010)." (*Id.*)

Specifically, Defendants argue that Mr. Patterson's testimony is based on arbitrary benchmark figures that ascribe a value of $100,000 to the "pleasure" of each year of Mr. Dominguez's life. (*See* Mot. 3; Mot. Ex. A; Patterson Dep. 29:16–30:3.) At his deposition, Mr. Patterson testified that the amount of $100,000 comes from the Ted R. Miller Study from the Journal of Forensic Economics. (Mot. Ex. A Patterson Dep. 30:13–14.) Mr. Patterson opines that

---

[3] Even though the Motion sometimes refers to Mr. Patterson's benchmark as $10,000, his report (Mot. Ex. A), uses the benchmark of $100,000.
[4] As stated in *Berry v. City of Muskogee, OK,* "appropriate compensatory damages [for §1983 wrongful death claims] would include medical and burial expenses, pain and suffering before death, loss of earnings based upon the probable duration of the victim's life had not the injury occurred, the victim's loss of consortium, and other damages recognized in common law tort actions." 900 F.2d 1489, 1507 (10th Cir. 1990).

the value of the pleasure for each year from the date of Mr. Dominquez's death through his normal life expectancy is $4,710,761.00. The value is calculated beginning with $100,000 per year, increased by 1% each year and discounted to its present value.

### III. DISCUSSION

Rule 702 governs the admissibility of expert witness testimony. In applying this rule, the Court acts as gatekeeper to ensure the relevance and reliability of all proffered expert testimony. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert,* 509 U.S. at 589). The Court has broad discretion in deciding whether expert testimony is sufficiently reliable. *Id.* at 152.

Hedonic damages are recoverable in § 1983 wrongful death cases. *See Romero v. Beyers,* 117 N.M. 422, 428, 872 P.2d 840, 846 (1994). Similarly, the Tenth Circuit has allowed an expert witness to provide "an explanation adequate to insure the jury did not ignore a component of damages allowable under state law" by offering "his interpretation of the meaning of hedonic damages" and identifying "four broad areas of human experience which he would consider in determining those damages." *See Smith v. Intersoll-Rand Co*., 214 F.3d 1235, 1246 (10th Cir. 2000). Based on this authority, Mr. Patterson will be permitted to offer generalized testimony about the *concept* of hedonic damages, and the Motion will be denied in part as to that aspect of Mr. Patterson's proffered testimony.

The majority rule in federal courts, however, is that expert testimony which places a *dollar figure* before the jury in an attempt to *quantify* the value of a human life in monetary terms is inadmissible and does not meet the relevance and reliability factors set forth in *Daubert* and its progeny. *See Smith,* 214 F.3d at 1244–45; *Raigosa v. Roadtex Transp. Corp.,* No. 04 CV 305 RLP/WDS, Doc. 60, at 4–5 (D.N.M. Feb. 10, 2005) (unpublished). Thus, the Court will not

allow Mr. Patterson to testify as to the monetary value of Mr. Dominguez's hedonic damages, and will not permit Mr. Patterson to express any opinion testimony regarding a numeric formula such as "benchmark figure," "guideline," or "range of values" to be used in calculating such damages. *BNSF Ry. Co. v. LaFarge Southwest, Inc.*, No. 06 CV 1076 MCA/LFG, 2009 WL 4279849, *2 (D.N.M. Feb. 9, 2009) (unpublished). *See also Myers v. Williams Manufacturing, Inc.*, No. 02 CV 157 WPJ/ACT, MEMORANDUM OPINION AND ORDER ON MOTIONS IN LIMINE (Doc. No. 151) at 7 (Nov. 14, 2003) (precluding an economics expert from testifying about hedonic damages using a $10,000 benchmark). The underlying methodology used to arrive at the quantitative measurements of the value of human life "does not meet the relevance and reliability requirements of *Daubert* and its progeny and will not assist the jury, regardless of whether the figure, formula, or 'range of values' in question is assigned to a specific decedent, a hypothetical individual, a statistical person, or a generic benchmark or guideline." *BNSF Ry Co.*, 2009 WL 4279849, *2. Accordingly, the Motion will be granted in part and all testimony from Mr. Patterson that ascribes an amount to hedonic damages, or the value of the enjoyment of life, will be excluded as unreliable and unhelpful to the jury.

IT IS ORDERED that DEFENDANTS' MOTION IN LIMINE TO EXCLUDE TESTIMONY OF WILLIAM PATTERSON CONCERNING HEDONIC DAMAGES (Doc. No. 158) is granted in part and denied in part as stated above.

_____
SENIOR UNITED STATES DISTRICT JUDGE